COMMONWEALTH *vs.* EDWARD G. FIELDING.
COMMONWEALTH *vs.* JOSEPH R. YANDLE.

Middlesex.    May 3, 1976. — September 15, 1976.

Present: HENNESSEY, C.J., BRAUCHER, KAPLAN, & WILKINS, JJ.

*Arrest. Probable Cause. Constitutional Law,* Admissions and confessions, Waiver of constitutional rights. *Waiver. Evidence,* Admissions and confessions, On cross-examination. *Witness,* Expert. *Practice, Criminal,* Examination of jurors, Disclosure of evidence, Charge to jury. *Robbery. Words,* "Reasonable doubt."

Where a police officer stated in his affidavit in support of an arrest warrant merely that he had received "reliable information" from an informant that the defendant had robbed and killed a clerk in a liquor store, and that, as a police officer, he was aware of the commission of the crime referred to, the arrest warrant was constitutionally invalid, and the subsequent arrest of the defendant pursuant to the warrant and without probable cause was unlawful. [100-103]
Where two defendants who were heroin addicts were given Miranda warnings on numerous occasions throughout interrogations lasting several hours, where they appeared alert, calm and lucid during the questioning, and where about an hour after complaining of suffering from withdrawal they were taken to a hospital and administered methadone, findings that the confessions were voluntarily made were warranted. [103-113]
Where breach of the Fourth Amendment to the United States Constitution by police in arresting the defendant pursuant to an invalid warrant was not deliberate, where about three hours intervened between the arrest and the defendant's freely made confession, and where during his interrogation the defendant was repeatedly informed of his rights, the invalidity of the arrest warrant did not render his confession inadmissible; nor was it improper to use the confession against a codefendant in establishing probable cause for his arrest. [113-115]
At a criminal trial, in determining the admissibility of a photograph of a blackboard diagram of the scene of the crime made and signed by the defendant, it was of no consequence that a "rights card" read to the defendant at the police station where the diagram was made omitted reference to his right, after commencing to speak to the police, to stop doing so at any time, where a different set of Miranda warnings which included the reference had been read to the defendant a number of times during his interrogation. [115]
Where defense counsel at a criminal trial asked a police officer in cross-examination "You didn't ask whether [the defendant] had a police

record?" a mistrial was not required by the officer's answer that "I asked him at one time if he had been arrested, and he said he was arrested in Arlington." [115]

Evidence at a criminal trial warranted the judge in finding that a doctor was qualified to give a medical opinion on the symptoms of heroin withdrawal. [115-116]

Where it was reported to a judge at a criminal trial that a person who had been challenged as a juror by the defense had said in the court house cafeteria that "[t]hat judge sure wanted me on there bad," and that the defendant "wouldn't be there if he wasn't guilty," it was adequate for the judge to interrogate the three persons on the venire who might have heard the remarks and to admonish the venire. [116]

At a criminal trial there was no error in the refusal of the judge to divulge to a defendant the name of an informant where the defendant did not establish an adequate basis for such a demand. [116]

Although the judge in a criminal case used a disapproved analogy on proof beyond a reasonable doubt, referring to "the standard of persuasion or conviction that you would [apply] in important matters in your own private affairs where you must make a decision," the charge, taken as a whole, was adequate. [116-117]

In answer to a question put by a jury to a judge in a criminal case whether they could convict of robbery if they found that money was not carried out of the premises, the judge's statement that a separation of money from the victim's dominion, even if brief in time and space, would be enough was correct. [117]

INDICTMENTS found and returned in the Superior Court on September 14, 1972.

Pre-trial motions were heard by *Travers, J.,* and the cases against the defendant Fielding were tried before him. The cases against the defendant Yandle were tried before *Hallisey, J.*

*John C. McBride* for the defendants.

*Bonnie H. MacLeod-Griffin,* Assistant District Attorney, for the Commonwealth.

KAPLAN, J.  For the fatal shooting of Joseph Repucci and robbery during the holdup of a liquor store in Medford on June 20, 1972, a Middlesex grand jury indicted two young men, Edward G. Fielding and Joseph R. Yandle, charging them with murder in the first degree and armed robbery. The codefendants moved before a trial to suppress the statements they had separately made to the police on July 1-2, 1972, contending that the statements were elicited through and resulted from illegal arrests, and

were not voluntary but given under the duress of drug "withdrawal." After voir dire, which consumed sixteen days of hearings, the judge denied the motions in principal part, though granting them in part. Subsequently a motion to sever the cases was made and granted, and the men were tried separately. The same judge, presiding at Fielding's trial, admitted Fielding's unsuppressed statements, basing himself in effect on the facts developed and the ruling made at voir dire. During Yandle's trial before another judge, application was made for further voir dire, and the jury were temporarily excused and additional evidence was received taking up 340 transcript pages. (This included testimony by Yandle who had not testified on the first voir dire as had Fielding.) The judge admitted Yandle's unsuppressed statements, on the basis, in effect, of the result of the first voir dire and his additional findings on the second. The defendants were each found guilty of the crimes charged.[1]

On their appeals to this court, taken under G. L. c. 278, §§ 33A-33G, the chief errors claimed by each are in the refusal to suppress the respective statements in toto, and in the corresponding rulings of the judges during trial admitting the unsuppressed statements in evidence as having been made voluntarily (the ultimate decision on that matter, however, being reserved to the jury).[2] We deal now with these claimed errors, leaving certain other alleged errors for short treatment later in the opinion.

---

[1] Fielding was sentenced to life imprisonment on the murder conviction and to a concurrent term of not less than twelve and not more than twenty years on the conviction of armed robbery. Yandle received a life sentence on the murder conviction and, on the armed robbery conviction, probation for five years from and after expiration of the life sentence.

[2] For Fielding, the assignments of error argued on this point were Nos. 1 and 4: the judge's denial (in part) of the motion to suppress, and his making the preliminary determination at trial that the unsuppressed statements were voluntary. For Yandle, the same points were argued under assignments Nos. 1 and 3 and nothing of substance was added by assignment No. 6 addressed to the judge's refusal to strike the statements from the jury's consideration.

I. ASSIGNMENTS OF ERROR REGARDING THE STATEMENTS
MADE TO THE POLICE.

As indicated, the facts regarding each defendant's state-
ments to the police were canvassed elaborately. The judge
made lengthy and detailed findings on the first voir dire
which in the case of Yandle were supplemented by further
findings by another judge. To sum up: On undisputed
facts, a warrant for the arrest of Fielding was held invalid
as having been issued without probable cause, and his
actual arrest was ruled illegal for being made without
probable cause (part A *infra*). However, appraising the
evidence of the course of events after the defendants were
arrested, including direct observations of the defendants,
the judge found that the Commonwealth had sustained
its burden of establishing that Fielding's statements to the
police, though perhaps made during an incipient stage of
drug withdrawal, were in fact voluntary and admissible
(barring, out of abundance of caution, any statements
made after methadone was administered to him at a hos-
pital); and, on a like basis, Yandle's statements were held
voluntary and admissible (with a similar exclusion) (part
B [1]-[6]). The judges did not accept the defendants'
contentions that their statements were foisted on them
by the police when they were under the duress of extreme
withdrawal and substantially incapable of volition (part
B [7]). On the facts, Fielding's unsuppressed statements
were not the contaminated "fruits" of his illegal arrest;
nor was the "fruits" argument available to Yandle, his
arrest being consequent upon those statements by Field-
ing (part C).

We find no reason to disagree with the judges' assess-
ments of the facts and are also in accord with the results
they reached on the law. We follow their findings closely
in the following narrative and discussion.[3]

A. *Illegality of the arrest warrant and of the arrest of*

---

[3] Although it is convenient at various places below to discuss the
Fielding and Yandle cases together, we have been sensible of the need
to appraise the cases finally on their individual merits.

*Fielding.* As noted, the crime occurred on June 20. On June 30, Inspector Griffin of the Medford police had an hour's conversation with an informant (unnamed). Griffin reported the substance to Lt. White who next morning made an oral statement to Anthony R. DiPietro, an assistant clerk of the First District Court of Eastern Middlesex, at Malden, for issuance of a warrant for the arrest of Edward G. Fielding. White stated that Griffin had received "reliable" information from an informant that Fielding (residing in Charlestown) had told the informant that he had held up a clerk in a liquor store in Medford and killed him with a .22 caliber gun. White said that he (White) knew as a police officer of the commission of the crime referred to. White said nothing more about the informant, and it appears that neither Griffin nor White had previously met the informant, and the informant had not, to their knowledge, previously supplied information to the police.

The arrest warrant issued. Around 6:30 P.M. that day (July 1), White and Griffin and other Medford officers (Inspector O'Reardon and Sergeants McGlynn and Malcolm) met with Detectives Antonucci and Ricci of the Boston police at division 15 in Charlestown, Boston, and informed them of the June 20 murder and of the warrant for Fielding's arrest. White apparently indicated that a 1964 or 1965 Pontiac automobile had been seen near the place about the time of the holdup; this information had come to the Medford police from two or three people who, around the time of the shooting, had seen a dark, beaten-up car of that description, carrying two men, going the wrong way on a one-way street near the store. The informant had evidently indicated that Joseph Yandle was regularly with Fielding and that Yandle used such a car. (The information about the car and the relation between Fielding and Yandle had not been mentioned to the clerk of court.) When White referred to the Pontiac, Antonucci said that could be Yandle's car and Yandle and Fielding were always together.

Responding to White's request for help in arresting

Fielding and in finding Yandle for questioning about the car, Ricci, O'Reardon, McGlynn, and Malcolm went out in a search car. About 7:30 P.M., they stopped a red sports car and a young man who got out, in answer to a question, said he was Edward Fielding. Thereupon Sergeant Mc-Glynn showed Fielding the warrant. Fielding was told he was under arrest for the murder of Joseph Repucci on June 20.

Assessing the foregoing facts, the judge held, we think correctly, that the arrest warrant was invalid under the Fourth Amendment to the United States Constitution because "probable cause" had not been shown to the clerk of court. The mistake of the police (and of the clerk) lay in assuming that the stated judgment of the police that the informant's information was "reliable" would suffice. What was missing was evidence to demonstrate the reliability of the informant. See *Commonwealth* v. *Vynorius*, 369 Mass. 17, 20-21 (1975); *Aguilar* v. *Texas*, 378 U.S. 108, 114 (1964).[4] The deficiency was not repaired by White's tendering his general knowledge of the commission of the crime which did not implicate Fielding. *Spinelli* v. *United States*, 393 U.S. 410, 415-416 (1969). Cf. *Commonwealth* v. *Cuddy*, 353 Mass. 305 (1967).

The arrest of Fielding at 7:30 P.M. was thus warrantless in a legal sense, but it could be held lawful if the knowledge then possessed by the police amounted to probable cause. *Whiteley* v. *Warden, Wyo. State Penitentiary*, 401 U.S. 560, 566 (1971). The judge could find that it did not. Still missing was anything solid pointing to Fielding, once the informant's naming him was discounted because the informant's reliability was not supported. (The judge noted incidentally that the informant's knowledge about the murder with a .22 caliber weapon could have been picked up from news accounts.) If there were some initial, acceptable evidence pointing to Fielding, the Pontiac could

[4] The judge also questioned whether enough was presented to base the informant's conclusion that Fielding had committed the crime. See *Aguilar* v. *Texas,* 378 U.S. 108, 114 (1964).

suggest Yandle and Yandle might lead back to Fielding and corroborate Fielding's connection; but here the chain failed at the first link.

We turn, then, to the substance of the evidence on the question of the voluntariness of the statements given to the police.

B. *Voluntariness of statements to the police.* (1) *Fielding's statements at Charlestown police station.* Immediately after Fielding was arrested, a Boston "rights card" containing the Miranda warnings was read to him, and he answered in the affirmative to the question whether he understood his rights. Now White, informed by radio, arrived, and Fielding was transferred to White's car which proceeded to the Charlestown station. During the brief journey, White read to Fielding the arrest warrant and a Medford rights card.[5] White asked whether Fielding, having his rights in mind, wished to talk to the police, and Fielding answered yes, but there was no further talk with Fielding in the car.

Arriving at the Charlestown station about 8 P.M., Fielding was again informed of his rights and put through a booking procedure by Lt. Leary, then in charge of the station. Fielding was told he could use the telephone and was advised to call his family and friends and get a lawyer. In fact he did make a telephone call. A Boston rights card was held up for Fielding to read, and he said he understood. He was then put in a cell. At 8:30 P.M. he was driven to Boston police headquarters by Patrolmen Thomas and Green and Sergeant Malcolm where his picture and fingerprints were taken. By 9:30 P.M. he was back in the cell at Charlestown.

Shortly afterward, White, returning from a search for Yandle, went to the cell block and asked Fielding whether he wanted to talk to the police — he didn't have to. Fielding said he did. Leary was informed. Meeting Fielding

---

[5] There were differences between the two cards, but, as the judge indicated, these can be considered immaterial in the light of all the facts. See point II (A) (1) below.

as he was led from the cell to the detectives' room, Leary put the same question to Fielding and got the same answer.

There were six officers in the detectives' room as Fielding entered (White, Griffin, McGlynn, O'Reardon, Antonucci, and Ricci) but four promptly withdrew leaving White and Griffin. To an offer of food, coffee, and cigarettes, Fielding said he wanted just a glass of water, which was provided. Again White read the arrest warrant and a Boston rights card and Fielding said he understood and wanted to talk about the case. He might feel better, White said, if he got it off his chest; would he be willing to give a statement? Fielding said yes, what did he have to lose. Griffin said Fielding was being cooperative and looked like a decent fellow who wouldn't do it deliberately. Fielding said it was an accident, he didn't mean to shoot the man. White then asked Fielding whether he would give a written statement and Fielding said yes, he would throw himself on the mercy of the court.

About 10:13 P.M. (within fifteen minutes after Fielding entered the room) White began to write in longhand a statement as given by Fielding. In the statement, Fielding, as speaker, acknowledged that he had received Miranda warnings and was making the statement voluntarily. Then followed a straightforward and circumstantial account of the events of June 20 (about 850 words) as follows. Yandle picked up Fielding in a 1964 or 1965 Pontiac in the early afternoon. They both needed a "fix" and therefore needed money. There was a gun in the car, a .22 caliber Smith & Wesson. Driving toward Somerville and then Medford, they decided to do a robbery, and settled on a small liquor store on Salem Street, Medford, as there were no customers in sight, only a clerk or manager. Fielding went in with the gun, Yandle parked nearby. During the holdup, as Fielding was taking money from a drawer with his right hand, holding the gun in his left, the man leaped forward and grabbed the gun, which discharged. The man was struck. Scared, Fielding fled. In the confusion that followed, the car was driven the wrong way on a one-way street.

Something more than an hour passed while Fielding told his story and White wrote it out, in the course of which Fielding asked for another glass of water. White handed the statement to Fielding but Fielding said he didn't want to read it, he was disgusted. White read the statement to Fielding who signed each page and affixed the date. He declined to make any changes. It was about 11:30 P.M. Fielding was returned to his cell. At no point had Fielding indicated to the officers a disinclination or inability to continue with his statement, nor did he say he was a drug addict or sick or needing treatment at a hospital. He exhibited no signs of sickness or of being otherwise than normal.

(2) *Fielding's statements at Medford police station.* About midnight Fielding, accompanied by White, Griffin, and Malcolm, was driven to the Medford police station. On the way he asked if he could get a fix at the hospital after reaching the Medford station; he was told, in effect, that this was up to Captain Glynn, in charge at Medford.[6] Arriving at Medford about 12:15 A.M., July 2, Fielding was booked; a Medford rights card was read to him and he signed it. It appears that after the booking Fielding complained to a Medford officer that he was sick, but there is no indication of further complaint as he was taken to Glynn for an interview. White was present at the meeting. After White summarized Fielding's statement, Glynn asked Fielding to describe what happened in the store. Fielding did so, using Glynn (at Glynn's suggestion) to enact the part of the victim. At Glynn's request, Fielding drew on a blackboard a diagram of the interior of the store and the adjacent street area. (A picture was taken of this sketch, later received in evidence.) Glynn then indicated — it was now about 12:45 A.M. — that Fielding would be taken to Lawrence Memorial Hospital, following en route the path of the Pontiac on June 20 as Fielding should

---

[6] There was testimony that the practice at the Medford station was to send to the hospital anyone claiming illness, whether or not connected with drugs.

indicate. One of the officers conducting Fielding (they were Lt. Keating and Inspectors Murray and McCarthy) made a reference to his rights as the car left. Fielding pointed out the path taken and other things. He had been uncomplaining, cooperative, and lucid throughout.

We interpolate here that just after Fielding had given his statement at Charlestown, White met Fielding's brother and girl friend in the booking area and suggested that they go to the Medford station, since Fielding would be taken there shortly. They went to Medford. The girl friend was brought into Glynn's office and talked with Fielding, partly in the officers' presence. As Fielding told her he was booked for murder, and that he had done it, he sniffled and cried. The brother was also brought in; to him Fielding said he didn't need a lawyer, the shooting was an accident.

(3) *Fielding at the hospital.* The ride to the hospital took perhaps ten minutes and about 1 A.M. Fielding talked with Dr. Stanley Cooper who was on emergency duty. Dr. Cooper testified that he found Fielding to be in no physical distress: he was not perspiring or sniffling; his eyes were moderately dilated, but not watery. Dr. Cooper judged him to be in no mental distress and indeed emphasized his cooperativeness and calm: he was sitting quietly, was pleasant, responsive, alert, rational, lucid.[7] Fielding had the needle marks of one who injected drugs and told Dr. Cooper he was feeling the effects of having had no drugs since he was in custody; he was a user of 25-30 bags of heroin daily and was feeling withdrawal symptoms. Largely on the basis of what Fielding told him, Dr. Cooper made a diagnosis of heroin withdrawal syndrome and prescribed — after discussion with Fielding as to his past experience — 50 mg. methadone and 1/100 grain atropine, the latter for stomach cramps.[8] The dosage was suited to a heavy user.

---

[7] An orderly at the hospital, John Kennedy, also testified to Fielding's apparent composure and said Fielding on leaving the hospital came by to thank him.

[8] It will be recalled that statements by Fielding beyond this point were ordered suppressed.

After a half hour at the hospital, Fielding returned to Glynn's office about 1:20 A.M. where he spoke with Glynn and signed each page of a typewritten copy of his statement, noting the time as 1:30 A.M. He was visited in the cell area by his brother and girl friend with whom he spoke privately for several hours.[9]

(4) *Arrest of Yandle.* The search for Yandle was intensified when White informed the officers of Fielding's statement at the Charlestown station. Word reached Yandle through his family that the police wanted to talk to him about a breaking and entering. After calling Boston police Officer Ricci and being told by Ricci that he was wanted for questioning about a car, Yandle about 5:15 A.M. drove up alone to the Charlestown station.[10] He acknowledged that his name was Joseph Yandle whereupon Ricci arrested him. (White and Griffin were also present.) [11]

(5) *Yandle's statements at Charlestown station.* Yandle was taken to the detectives' room where he confronted White, Griffin, and Antonucci. White read from a Boston rights card. Yandle declined refreshment. White told Yandle why he had been arrested and said Fielding was also under arrest for the murder. On Yandle's expressing disbelief about Fielding, White showed him Fielding's arrest sheet, said Fielding had confessed, implicating them both, and finally read and let Yandle read parts of Fielding's statement. Yandle said he didn't do the shooting and would tell only what he had done. He said he would give a statement.

White then took Yandle's statement (some 750 words) in the way he had taken Fielding's, the process consuming about an hour. The two statements tallied generally, but

---

[9] We omit an account of Fielding's return to the hospital about nine thirty that morning when he was seen by Dr. Moheb El Masry who followed Dr. Cooper's diagnosis and treatment.

[10] Yandle admitted at the Medford station (see below) that the car was the Pontiac used on June 20.

[11] In his findings on the first voir dire, the judge stated that Ricci gave Yandle his rights immediately after the arrest, but on second voir dire the judge said he did not go along with that finding.

there were discrepancies: Yandle said Fielding had pro-
cured the gun and had loaded it in the car. Yandle read
his statement as recorded by White, then White read it to
him and he signed each page. Again Yandle refused nour-
ishment. He was booked (about 6:50 A.M.), taken to
Boston headquarters to be photographed and fingerprinted,
and returned to Charlestown. During the period through
the reading of the statement and beyond, Yandle appeared
calm, responsive, coherent, and lucid.

(6) *Yandle at Medford station and the hospital.* From
Charlestown, Yandle was taken by White, Griffin, and
Malcolm to the Medford station, arriving there about
8 A.M. During the ten minute drive, Yandle said he needed
a fix and wanted to go to the hospital (his first reference
to drugs except for the remark in his statement recorded
by White). This drew the response that it would have to
be cleared with Captain Glynn. At Medford station, Yan-
dle was booked by Sergeant Davoli and signed a Medford
rights card and said he understood his rights. He was told
he could use the telephone. While going through the pro-
cedure of picture taking and fingerprinting, Yandle told
Sergeant Murphy that he felt sick, and this in turn reached
Captain Glynn. It appeared that Yandle was mildly ill
and feeling the onset of drug withdrawal.

Yandle was taken to the hospital by Lt. Dennis and
Sergeant Carr. He agreed to point out on the way the
route followed on June 20. One of the officers, intending
to ask questions, commenced to give Yandle his rights, but
Yandle, interrupting, said he didn't want to hear them
further, and proceeded to describe the crime in detail, with
Carr taking notes. He still appeared calm and in no distress.

At the hospital about 8:45 A.M., Yandle was seen by Dr.
Cooper. By this time Yandle was complaining of a mild
frontal headache and abdominal pains and was sniffling,
but Dr. Cooper observed no mental distress and no severe
physical distress. Yandle was sitting quietly and in his
talk with Dr. Cooper was subdued, but rational, not con-
fused. Dr. Cooper's diagnosis was heroin withdrawal syn-

drome, based primarily on what Yandle told him; he prescribed 60 mg. methadone and an injection of atropine, the former in the light of Yandle's report of his prior experience.[12]

On his return to the Medford station about 9:30 A.M., Yandle signed and dated a typewritten copy of his statement with Glynn, White, Keating, and Officer McIsaac present. He was then asked whether he was prepared to face Fielding. He said he was willing if Fielding was also willing. At 9:50 A.M. Fielding was brought in. Both signed a Medford rights card. White read the statements by Fielding and Yandle and the men said the statements were true, with Yandle, however, pointing to discrepancies.[13]

(7) *Rejection of defendants' claims of duress.* On the case as described thus far, this court surely would not be entitled to say that the triers erred in concluding that the Commonwealth established the voluntariness of the unsuppressed statements. The defendants made strenuous attempts to escape from the web of the Commonwealth's proof, but the efforts failed. They sought to show that they were habitual, heavy users of heroin in July, 1972, and that their last injections of the drug were in such amounts and so many hours removed from the times at which their statements were given as to raise the inference that they were then experiencing severe withdrawal.[14] They testified that they were in fact in desperate condition, pleading to be taken to the hospital and prepared to do nearly anything to get there, and that the police withheld such relief in order to force their signatures on statements they could hardly understand, so deep was the mental confusion

---

[12] The judge suppressed Yandle's statements beyond this point.

[13] We omit a description of conversations at Medford station between police officers and Fielding and Yandle later that day about a number of robberies; also a rather discursive interview with Yandle about the drug habit and other matters.

[14] The judge dealt with internal inconsistencies in Fielding's testimony about his last fix.

brought about by their craving for the drug.[15] Except as it was shown that the defendants were heavy users of heroin,[16] which was perhaps as well proved by the fact that they withstood the large doses of methadone as by the historical evidence of addiction they offered, the defendants' testimony about their condition at the time of their statements had little if any solid confirmation beyond the defendants' own say-sos,[17] and were, of course contradicted by much testimony from observers. The defendants implied, but failed to prove, a design by numerous police officers to treat them unjustly, and demanded belief in improbabilities: that Yandle, supposedly in withdrawal, would drive alone in the middle of the night to a police station; or that the police would hand Fielding (as he testified) a picture of a liquor store that he had never seen and require him to make from it, and sign, a blackboard diagram — all to add convincingness to the confession they had wrested from him.

There was voluminous testimony by physicians with psychiatric specialties (including Drs. Robert Mezer, Gerald McKenna, and David McGaw). As we have indicated, the conclusion was warranted that the defendants were heavy users in July, 1972, though the exact degrees of addiction — physical and psychological dependencies — must remain problematical, especially as addiction is determined by many factors varying with individuals. The physicians described at length the symptoms and signs of

---

[15] There was no claim that the defendants, even if not suffering seriously from withdrawal, were unbalanced by great anticipatory fear of withdrawal, as suggested in *United States ex rel. Hayward* v. *Johnson,* 508, F.2d 322, 327-328 (3d Cir.), cert. denied, 422 U.S. 1011 (1975).

[16] The trial judge accepted that Yandle had also been a user of barbiturates, but he disbelieved Yandle's testimony that he had taken a barbiturate in addition to heroin on July 1.

[17] We take particular note in this connection of testimony as to Yandle's activities during the evening and morning before his arrest offered by Yandle's girl friend and a worker at a veterans' hospital where Yandle had been a patient. The testimony was not materially helpful to Yandle's cause.

withdrawal from heroin.[18] They could say that if the defendants' accounts of how they felt around the time of their confessions were accepted as true, then it was probable that they were suffering from severe withdrawal and their confessions might be subject to question on grounds of involuntariness.[19] But the case was very different if the behavior and condition of the defendants from the time of arrest were as testified to by the police and other observers. Thus the physicians' testimony did not materially buttress the defendants' stories of extreme distress, which the triers disbelieved.[20]

To conclude on the issue of voluntariness: Our account is a distillation of the truth about the questioned statements as perceived by the trial judges. Presumably the juries did not perceive the situation differently. In this view the police acted correctly throughout (Miranda warnings were given in profusion) and the defendants, although troubled at the end by drug withdrawal (Yandle perhaps more than Fielding), knowingly and fully surrendered their

---

[18] There was testimony that the constellation of symptoms and signs constituting the heroin withdrawal syndrome includes headache, sniffling, running nose, watering eyes, dilation of pupils, sweating, excessive salivation, stomach cramps, chills, aching all over, paleness, "gooseflesh," elevated blood pressure, higher temperature, pulse, and respiratory rates, shaking, nausea, vomiting, diarrhea — all against a psychological background of uneasiness, restlessness, apprehension, and anxiety. The condition is progressive and cumulative and concomitantly the desire for relief becomes more urgent and clamant. There are individual differences and the symptoms and signs may not all appear and do not appear in an invariant order. (It is regrettable that Dr. Cooper did not take physical readings as for blood pressure and temperature.) See a discussion of "The Nature of Addiction" by Judge Wright, dissenting, in *United States* v. *Moore,* 486 F.2d 1139, 1229-1235 (D.C. Cir.), cert. denied, 414 U.S. 980 (1973).

[19] The testimony indicated that while severe withdrawal exerts pressure on the subject to do whatever may be called for in order to secure relief, it does not by any means follow that everyone in such withdrawal would confess to serious crime, although in fact innocent of it, in order to get a fix or a methadone substitute. The will to resist varies from person to person. (Indeed, there was testimony that subjects withdrawing from heroin do not lose the capacity for rational thought and choice, as those withdrawing from alcohol are said to do.)

[20] The judges recorded their disbelief expressly in their findings.

rights to have the assistance of counsel and to remain silent, and made confessions which were voluntary in the sense in which statements may be so, although made by persons in official custody. These were young men of normal intelligence and some worldly experience[21] who, without insistent questioning or other pressure or any brutality on the part of the police, confessed their crimes. Their reasons can be guessed at: because they believed they had been found out, because they thought the "accidental" character of the killing and their prompt admissions would palliate their offenses, because confession relieved their minds. While the demands of the drug habit occasioned the crimes, drug withdrawal did not impose such duress as to invalidate the confessions. We need only refer to cases describing and exemplifying the Fifth Amendment standard of "voluntariness" in relation to confessions (*Commonwealth* v. *Mahnke,* 368 Mass. 662, 679-680 [1975]; *Delle Chiaie* v. *Commonwealth,* 367 Mass. 527, 533-536 [1975]; *Schneckloth* v. *Bustamonte,* 412 U.S. 218, 223-227 [1973]; *Lego* v. *Twomey,* 404 U.S. 477, 482-487 [1972]; *Jackson* v. *Denno,* 378 U.S. 368, 376-377 [1964]; *Townsend* v. *Sain,* 372 U.S. 293, 307-310 [1963]), and to note particularly decisions dealing with confessions by persons addicted to narcotic drugs. See *United States ex rel. Hayward* v. *Johnson,* 508 F.2d 322, 324-328 (3d Cir.), cert. denied, 422 U.S. 1011 (1975); *United States* v. *Poole,* 495 F.2d 115, 120-122 (D.C. Cir. 1974), cert. denied, 422 U.S. 1048 (1975);[22] *United States* v. *Monroe,* 397 F. Supp. 726

---

[21] The psychiatrists found them of normal intelligence; Fielding, twenty-one years old, had served in the Navy, and Yandle, aged twenty-three, had served with the Marines.

[22] "At trial, appellant's attack on the voluntariness of his confession was based on his testimony that he was undergoing heroin withdrawal when he made the statement. This testimony was contradicted by all other witnesses; in fact, appellant's testimony as to the sudden onset and immediate severity of his symptoms ... does not lend much credence to his story. The trial court believed the police on this point, and we see no warrant to reverse." *United States* v. *Poole,* 495 F.2d at 119.

(D.D.C. 1975); *United States* v. *Arcediano,* 371 F. Supp. 457, 459-469 (D.N.J. 1974).[23]

C. *The question of "Fruits."* That Fielding's unsuppressed statements were acts of free will within the Fifth Amendment definition qualified them for admission — unless they were fatally infected by the violation of the Fourth Amendment that was incident to his arrest. See *Logan* v. *Capps,* 525 F.2d 937, 940 (5th Cir. 1976). Such infection will be held to have occurred when the illegality of the police behavior is sufficiently grave and the connection between the illegality and the making of the statements is sufficiently intimate.

The whole matter was recently reexamined by the Supreme Court in *Brown* v. *Illinois,* 422 U.S. 590 (1975), which, however, did not depart from prior precedents but was in the line of *Wong Sun* v. *United States,* 371 U.S. 471 (1963),[24] and *Morales* v. *New York,* 396 U.S. 102 (1969).[25] Indeed the discussion by the judge on first voir dire in the present cases, although antedating *Brown,* was quite consistent with it.

The State in the *Brown* case had apparently taken the view that a statement otherwise voluntary was to be admitted if Miranda warnings intervened between an illegal arrest and the utterance. Rejecting any such mechanical rule of insulation, the Court said: "The *Miranda* warnings are an important factor, to be sure, in determining whether

[23] *Commonwealth* v. *Hosey,* 368 Mass. 571 (1975) (not a narcotic drug case), is not comparable to the present cases; there the breakdown of cognition and volition was evident and very serious. Cf. *Commonwealth* v. *Daniels,* 366 Mass. 601 (1975).

[24] "We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, Evidence of Guilt, 221 (1959)." *Wong Sun* v. *United States,* 371 U.S. at 487-488.

[25] For this reason of the essential continuity of standards, no question of "retroactivity" arises. See *United States* v. *Rose,* 526 F.2d 745, 748 n.3 (8th Cir. 1975), cert. denied, 425 U.S. 905 (1976).

the confession was obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, . . . and, particularly, the purpose and flagrancy of the official misconduct are all relevant." 422 U.S. at 603-604 (citations in text and footnotes omitted).

Considering these factors, we are clear that the Commonwealth sustained its burden of showing admissibility. The breach of the Fourth Amendment was not a deliberate one committed by the police with a purpose to facilitate the procuring of a statement from Fielding. Significantly, the police did not proceed on their own, but sought and obtained a warrant. They lacked sufficient information to measure up to probable cause, but their misbehavior cannot be called flagrant. In these circumstances, outlawing Fielding's statement would hardly have served an important demonstrative purpose of deterring the police from future malfeasance.[26] Between the arrest and the confession there was a space of some three hours in which Fielding could consider his position. In that interval Fielding was given Miranda warnings and also told in less formal terms that he need not make any statement. He used the telephone but apparently did not seek counsel; in his later remark to his brother he adverted to the question of counsel but showed he had made a decision against that assistance. Because of these conditions attending the confession, and finally because the confession was freely made, it stands apart from the arrest.[27]

[26] See the importance attached to the question of the bona fides of the police, and the discussion of deterrence of official misbehavior, in the concurring opinion of Mr. Justice Powell in the *Brown* case, 422 U.S. at 606, 610-612. See also *United States* v. *Peterson,* 524 F.2d 167, 180-181 n.20 (4th Cir. 1975), cert. denied, 423 U.S. 1088, and 424 U.S. 925 (1976).

[27] *Ryon* v. *Maryland,* 29 Md. App. 62 (1975) (on remand from the Supreme Court of the United States "for further consideration in light of *Brown* v. *Illinois,*" 422 U.S. 1054 [1975]), is cited as reaching a contrary result, but there, as in the *Brown* case, the illegality of the arrest was flagrant. There were other distinguishing features in *Ryon* and *Brown.*

As Fielding's confession is held to be uncontaminated by the Fourth Amendment violation, Yandle cannot complain of its being used against him in establishing probable cause for his arrest. Cf. *Michigan* v. *Tucker,* 417 U.S. 433 (1974).

## II. Other Assignments of Error.

A. *Fielding's assignments.* (1) Fielding assigns as error (No. 6) that the judge admitted in evidence at trial a photograph of the blackboard diagram made and signed by him at the Medford station. The claimed error is put on the ground that the Medford rights card read at the Medford station omitted particular reference to the right of the person in custody, after commencing to speak to the police, to stop doing so at any time. Without pausing to consider whether such a reference is an indispensable part of the Miranda warnings (see *People* v. *Tubbs,* 22 Mich. App. 549, 553-556 [1970]; *People* v. *Hooper,* 50 Mich. App. 186, 195-196 [1973]; cf. *Miranda* v. *Arizona,* 384 U.S. 436, 473-474 [1966]), we may note that the Boston rights card, read to Fielding a number of times before, did have the statement, making the omission on the Medford card inconsequential, as the judge said; and it is surely not required that a full-blown set of warnings be given at each step in the connected handling of a person in custody. See *Commonwealth* v. *Valliere,* 366 Mass. 479, 487 (1974); *United States* v. *Hopkins,* 433 F.2d 1041, 1044-1045 (5th Cir. 1970), cert. denied, 401 U.S. 1013 (1971).

(2) In response to the question at trial, "You didn't ask whether he [Fielding] had a police record?" Captain Glynn answered, "I asked him at one time if he had been arrested, and he said he was arrested in Arlington." The judge struck the answer on motion but refused a mistrial as requested by defense counsel at the side bench (assignment No. 7). The question was asked in cross-examination by defense counsel himself, and he could not fairly claim a mistrial when he drew an answer which to a lay witness would seem properly responsive.

(3) There is no substance in Fielding's claim (assign-

ment No. 8) that the judge erred in allowing Dr. Cooper
to testify at trial to the "medical symptoms of withdrawal
from heroin" (as the judge expressed it). We think Dr.
Cooper's experience, as put in evidence, was sufficient to
justify the judge in qualifying him for the purpose of
giving the medical opinion. See *Commonwealth* v. *Bellino*,
320 Mass. 635, 636-638 (1947).

B. *Yandle's assignments.* (1) Error was assigned (No.
2) to the judge's handling of an extraordinary situation
that arose when it was reported to him that a person who
had been challenged as a juror by the defense had said
in the court house cafeteria that "[t]hat judge sure wanted
me on there bad," and the defendant "wouldn't be there
if he wasn't guilty." The judge interrogated the three
persons in the venire who might have heard the remarks
(they finally did not serve on the jury that heard the
case); the judge also admonished the venire. We cannot
conceive that any prejudice could survive. Yandle would
have had the judge do more in the way of questioning the
venire, or discharge it, but we believe the judge's actions
were adequate.

(2) The judge declined to require the prosecution to
divulge the name of the informant who spoke to Officer
Griffin, leading to the issuance of the warrant for the arrest
of Fielding. Yandle assigns this as error (No. 4). Under
*Commonwealth* v. *Johnson,* 365 Mass. 534, 544-546 (1974),
we think Yandle did not establish an adequate basis for
such a demand.

(3) In his charge on proof beyond a reasonable doubt,
the judge referred analogically to "the standard of per-
suasion or conviction that you would [apply] in important
matters in your own private affairs where you must make
a decision," but this was accompanied by remarks about
"more than showing a strong probability of guilt," and
about each juror's having a "moral certainty" and "abiding
conviction." The analogy objected to (assignment No. 8)
is not a good one, but we believe the charge as a whole
adequately conveyed the basic thought. See *Common-
wealth* v. *Gilday,* 367 Mass. 474, 497-498 (1975); *Com-*

371 Mass. 117                                            117

SDK Med. Cmptr. Servs. Corp. *v.* Professional Operating Mgt. Group.

*monwealth* v. *Coleman,* 366 Mass. 705, 712 (1975); *Commonwealth* v. *Ferguson,* 365 Mass. 1, 12 (1974).

(4) There is a challenge to the correctness of the judge's answer to a question put to him by the jury (assignment No. 9). The jury wanted to know whether they could convict of robbery if they found that the money was not carried out of the premises, and the judge answered in effect, supplementing his main charge, that a separation of the money from the victim's dominion, even if brief in time and space, would be enough. The proposition was correct. See *Commonwealth* v. *Jones,* 362 Mass. 83, 90 (1972); *Commonwealth* v. *Johnson,* 1 Mass. App. Ct. 68, 70 (1973). Cf. *Commonwealth* v. *Stewart,* 365 Mass. 99, 108 (1974).

Finally, reviewing each case, we find no ground under G. L. c. 278, § 33E, for taking any action other than to affirm the judgment.

*Judgments affirmed.*