## COMMONWEALTH *vs.* CLARENCE DEAN.

Worcester.   October 11, 1985. — December 4, 1985.

Present: DREBEN, KAPLAN, & WARNER, JJ.

*Practice, Criminal,* Fair trial, Mistrial, Variance, Instructions to jury.

At the trial of kidnapping and assault and battery charges against a defendant who had earlier been acquitted on a related charge of rape, certain remarks in the victim's testimony suggesting forcible sexual acts by the defendant were not so prejudicial as to require a mistrial. [179-180]

At the trial of a defendant charged with kidnapping his estranged wife and with assault and battery on her by means of a dangerous weapon, during which defense counsel, in cross-examining the victim, brought out that previous to the marriage the victim had had a child by someone other than the defendant and then asked whether the child had run away from home, to which the victim answered that the child had been driven out by the defendant's constant threats of violence and of killing him, the judge did not err in denying the defendant's motion for a mistrial and, instead, ordering the answer struck and directing the jury to disregard it. [180-181]

On appeal from a kidnapping conviction, there was no merit to the defendant's contention that there was a fatal "variance" between the indictment, which charged the defendant with kidnapping the victim "with intent to cause her to be held to service against her will," and the judge's instructions to the jury, which stated that the defendant must be shown to have intended a "secret confinement," without instructing in the alternative on intent to cause her to be "held to service." [181-182]

INDICTMENTS found and returned in the Superior Court Department on March 5, 1982.

Following decision by this court, 17 Mass. App. Ct. 943 (1983), the cases were tried before *John P. Sullivan,* J.

*Carlo A. Obligato,* Committee for Public Counsel Services, for the defendant.

*Katherine E. McMahon,* Assistant District Attorney, for the Commonwealth.

KAPLAN, J.   The defendant, Clarence Dean, appeals from judgments entered upon verdicts of a Worcester County jury

finding him guilty of the crimes of kidnapping (G. L. c. 265, § 26) and assault and battery with a dangerous weapon (G. L. c. 265, § 15A). He was sentenced to concurrent terms of three and one-half to six years at M.C.I., Walpole, sentences suspended, probation for five years.[1] The grounds of appeal are that certain happenings at trial compromised its fairness, and that there was a "variance." We affirm.

1. *Sketch of the facts.* Sometime in September, 1981, Annette Dean, wife of the defendant, left him and went to a place on Cape Cod, taking their two children with her. In late December she returned with the children — one aged eight months, the other two years — to her mother's house in Fitchburg. The defendant resided in Leominster. There were proceedings regarding custody of the children of which the result apparently was that "legal" custody vested in the Department of Social Services, and "physical" custody in Annette, with the defendant entitled to visitation.

We summarize Annette's testimony to events on December 26 and thereafter.[2] That morning the defendant phoned her and asked for a chance to speak with her. He drove her and the children to his apartment, where they spent some hours. About 10:30 P.M. he commenced driving them back to Fitchburg but, showing much agitation, he passed by the Fitchburg road exits, took route 2 in a westerly direction, then turned left on route 31, and traveled south toward the town of Princeton. Around this time, and intermittently during the long trip ahead, he spoke of having nothing to live for and of wanting to commit

---

[1] Upon the same episode, the defendant had previously been tried and found guilty of the same crimes but acquitted of a further charge of rape. The judgments were reversed by this court on the ground that cross-examination of the complaining witness, his wife, had been unduly restricted. *Commonwealth* v. *Dean,* 17 Mass. App. Ct. 943 (1983). The fact that the defendant had served two years before the appeal was decided persuaded the judge to suspend the present sentences. With regard to the probation, the defendant was to avoid contact with his wife or children (subject to possible change if arrangements for visitation or the like were approved by competent authority and reported to the judge).

[2] Some matters are reserved to point 2, *infra.*

suicide and to destroy the whole family. Stopping the car in a wooded, dark spot, he began to choke Annette — he said he would make her pay for his misery. He drove further south on 31, parked, and again choked her. She managed to draw herself up on the front seat and sounded the horn with her foot. She screamed. He seized her and bit her nose. She retreated to the back seat where the children were placed and opened the door with some purpose of getting out, whereupon the defendant ran the car wildly, swerving left and right. He drew a knife from the front compartment and said he would use it.

He ordered her to the front seat, disposed her across his knees, and, driving down side roads with one hand on the wheel, he put the knife to her neck, to the back of her ear, and at her ribs. He returned to route 2 and about 12:30 A.M. (December 27) stopped at a Wayside Furniture lot. The children were screaming in the rear. He threatened to cut off her leg and in fact struck her with the knife in her left thigh, drawing blood. At this point she needed to urinate and had to do so on the floor of the car.

The defendant said he would take her to the hospital, and took on gas near the Leominster hospital — it was now about 2:00 A.M. — but then, after a stop at a K-Mart parking lot, he went west on route 2, to the environs of the town of Orange. Halting at a rest area, he handcuffed Annette to himself,[3] and tried to sleep.

About 6:30 A.M., he removed the handcuff and the trek resumed west on route 2, onto route 91, and then south on 91 almost to the Connecticut border. He pulled to the side of the road, wanting sleep. Some time past 8:30 A.M. a Massachusetts State trooper drew up and spoke to the defendant (seated in the driver's seat) about the cardboard license the car was carrying in lieu of a metal plate. The defendant reassured the trooper. Annette remained silent. A little further south on 91, in Enfield, Connecticut, the party ate food at a drive-in. Headed back to Massachusetts, north on 91, the defendant stopped for

---

[3] The defendant apparently was a provisional correction officer. He was in uniform at the time.

some rest. Annette was obliged to urinate in the car. By this time the children were wet, cold, and filthy, and needed changing.

Now the car traversed the whole length of route 91 in Massachusetts and reached Vermont. Here the defendant turned around, went south on 91, and reentered route 2 in the vicinity of the town of Gill. The defendant handcuffed Annette to the wheel while he entered a small variety store and bought pampers for the children and snack foods. The car approached Fitchburg around 10:00 P.M. after trying back roads in or about the towns of Ware, Barre, and Hardwick. As the defendant feared going to his apartment because the police might be there, he told Annette to phone the Leominster police and tell them she was all right. She made the call with the defendant nearby. He wanted the message to reach a Lieutenant LaPlume and Annette did talk to the officer from the Double Dragon restaurant, where the car had finally arrived.

They returned now to the place of beginning, the defendant's apartment in Leominster. On the way, the car ran out of gas. The defendant was assisted by a passing vehicle to go to a gas station. Returning, he met a State trooper who had come on the scene and spoke briefly to him.

At the apartment Annette changed her underwear. She placed in the medicine chest the defendant's knife which he had given her sometime that afternoon. All went back to the car and the defendant drove to the Henry Weywood Memorial Hospital in Gardner, where Annette was treated in the emergency room for the thigh injury. At 4:00 A.M. (December 28) she and the children arrived back at the house in Fitchburg.

The following morning she called an elder of her church and later met him and another and followed their advice to report the matter to the Fitchburg police.

Annette's account was amply corroborated. Independent evidence confirmed that on the morning of December 28, her nose was bruised, there were cuts on her neck and behind her ear, and a wound on her left thigh (verified by her bloodied jeans, in addition to the hospital record). The condition of the interior of the car was testimony to the character of the journey. The knife and handcuffs turned up as expected.

The jury could find unbelievable any suggestion that Annette's story in its salient features had been invented by her or exaggerated to the point of falsification (and the wounds possibly self-inflicted) in order to bolster her ultimate claim to the children. The defense could point to occasions when Annette might have tried to escape or summon help but failed to do so. Such omissions would not in themselves palliate the abduction or assault; and a jury could find explanation in Annette's concern for the safety of the children, her fear of what the defendant might do if she disregarded his warning (repeatedly given) that she should not involve third persons, and the turbulence of her emotions as she was being abused by the man to whom she had been married for three years. A number of seeming oddities in her behavior are similarly explicable,[4] and, upon a reading of the entire record, leave the case against the defendant notably strong.

2. *Problems at trial.* The defense had moved in limine to bar reference at trial to any allegations of forcible sexual acts on the part of the defendant.[5] This was acquiesced in, and the prosecutor spoke to Annette and other prospective Commonwealth witnesses accordingly. However, in describing the first choking episode, Annette said the defendant "finally let go, and he said to me, 'But before I kill you, you're going to get down on it.'" She said further, "He said he wanted me to do something, which I refused to do." At this point defendant's counsel asked for a bench conference. The judge wanted to know whether this passage of the testimony could be got by quickly and to this end he heard further testimony by the witness under questioning by the prosecutor in the absence of the jury. Satisfied, the judge denied a motion for a mistrial which the defense then made. As the defense preferred not to highlight the witness's remarks, the judge did not order them struck or make any other comment. The direct examination

---

[4] For instance, she made no complaint to the defendant's half brother and another who were present in the apartment when the family returned there in the early hours of December 28.

[5] Note the previous acquittal of rape, note 1, *supra.*

resumed before the jury. Although the witness had been again warned during the bench conference, she made a slanting reference to the subject later in her testimony when she interjected, "Something else happened there that I can't testify about . . . ." The judge allowed a motion to strike and instructed the witness to answer the precise question and not to volunteer.

The witness's statements, reflecting on the defendant, were vague, fleeting in relation to a sizeable record, and given no special prominence. In situations of this sort, much must be left to the discretion of the trial judge, see *Commonwealth* v. *A Juvenile*, 365 Mass. 421, 439 (1974); *Commonwealth* v. *Hoffer*, 375 Mass. 369, 372-373 (1978); *Commonwealth* v. *Cunneen*, 389 Mass. 216, 223 (1983); *Commonwealth* v. *Denson*, 16 Mass. App. Ct. 678, 681 (1983), and we are not prepared to overrule his evident view that the essential fairness of the proceeding had not been impeached. For decisions on somewhat similar facts, see *Commonwealth* v. *Appleby*, 389 Mass. 359, 380 (1983); *Commonwealth* v. *Simmonds*, 386 Mass. 234, 240-241 (1982).

The other happening at trial that needs attention followed upon a question put near the start of cross-examination. Defense counsel brought out that Annette had a previous child, not by the defendant. He asked whether that child had run away from home. This drew the answer that he had been driven out by the defendant, who threatened him constantly with violence and threatened to kill him. Counsel said the answer was not responsive and moved for a mistrial. The judge denied that motion but ordered the answer struck and directed the jury to disregard it.

It is not clear why counsel entered upon the question of the child's disappearance. Perhaps it was to mark a special source of strain in the relation between husband and wife that might deepen the wife's purpose (as the defense might urge) to see the defendant convicted. The judge remarked at the bench that counsel had put himself on dangerous ground — the witness's answer to the question was "naturally responsive" although not technically so.

In *Commonwealth* v. *Fielding*, 371 Mass. 97 (1976), defendant's counsel in questioning a police officer put a question to

which the officer gave an unresponsive and prejudicial answer. The judge "struck the answer on motion but refused a mistrial as requested by defense counsel at the side bench . . . ." *Id.* at 115. On appeal, the court upheld the trial judge. The court said (at 115): "The question was asked in cross-examination by defense counsel himself, and he could not fairly claim a mistrial when he drew an answer which to a lay witness would seem properly responsive." (There is no claim that in asking the question, or otherwise in conducting the defense, counsel in the present case fell below the standard of proficiency required by *Commonwealth* v. *Saferian,* 366 Mass. 89, 96 [1974].)[6]

3. *"Variance."* Instructing the jury about the findings necessary for a conviction of kidnapping, the judge followed the language of the clause of the statute[7] that we have marked [1], then, in the alternative, the language of clause [2], and, in addition (drawing on clause [3]), he stated that the defendant must be shown to have "intended such a secret confinement."[8] The defendant objected that the indictment had charged an intent "to cause [the victim] to be held to service against her will" (drawing upon an alternative expression in clause [3]).

---

[6] When, at the hospital, Annette declined to tell the doctor how she had come by the cut in her thigh (evidently she had an understanding with the defendant that she would not tell), the doctor gave her a "battered woman" telephone number. Upon objections by the defense, which the judge sustained, the fact came before the jury in somewhat attenuated form. In the light of all the evidence, this particular can hardly be thought consequential.

[7] General Laws c. 265, § 26 (first sentence), as appearing in St. 1971, c. 900, reads as follows: "[1]Whoever, without lawful authority, forcibly or secretly confines or imprisons another person within this commonwealth against his will, or [2] forcibly carries or sends such person out of this commonwealth, or [3] forcibly seizes and confines or inveigles or kidnaps another person, with intent either to cause him to be secretly confined or imprisoned in this commonwealth against his will, or to cause him to be sent out of this commonwealth against his will or in any way held to service against his will, shall be punished by imprisonment in the state prison for not more than ten years or by a fine of not more than one thousand dollars and imprisonment in jail for not more than two years."

[8] In *Commonwealth* v. *Ware,* 375 Mass. 118, 119-120 (1978), the court suggested that clause [1] might be complete, with specific intent not required. (The same would apply to clause [2].)

This difference between the instruction and the indictment, the defendant argues, is a fatal "variance." But "against her will" already appeared in the language used from clause [1]. It is not clear what of substance the defendant supposed would be added by "held to service" in distinction from "secret confinement," especially as he offered no definition of the former. In any event, the defendant is unable to show any material prejudice to himself in consequence of the instruction, nor does he claim to have been misled or surprised by the evidence brought against him (the prior trial was itself informing, see note 1, *supra*). The variance statute, G. L. c. 277, § 38,[9] applies to instructions as well as to evidence. See *Commonwealth* v. *Hobbs,* 385 Mass. 863, 870 (1982); *Commonwealth* v. *Costello,* 392 Mass. 393, 402-404 (1984).

*Judgments affirmed.*

---

[9] "A defendant shall not be acquitted on the ground of variance between the allegations and proof if the essential elements of the crime are correctly stated, unless he is thereby prejudiced in his defence. He shall not be acquitted by reason of an immaterial misnomer of a third party, an immaterial mistake in the description of property or the ownership thereof, failure to prove unnecessary allegations in the description of the crime or any other immaterial mistake in the indictment."