## Commonwealth vs. Emilian Paszko.

Hampshire.   October 3, 1983. — February 14, 1984.

Present: Hennessey, C.J., Liacos, Abrams, Nolan, & Lynch, JJ.

*Homicide. Identification. Practice, Criminal,* Voluntariness of state-
ment, Retroactivity of judicial holding, Discovery, Judicial discretion,
Grand jury proceeding, Venue, Fair trial. *Attorney at Law,* Work
product. *Evidence,* Admissions and confessions, Photograph, Judicial
discretion, Other offense, Chain of custody, Consciousness of guilt.
*Hypnosis. Constitutional Law,* Admissions and confessions, Search
and seizure. *Search and Seizure,* Motel room. *Witness,* Privilege, Im-
peachment, Self-incrimination.

There was no error in the denial of a defendant's pretrial motion to sup-
press certain out-of-court photographic identifications and a subse-
quent in-court identification of the defendant by witnesses who, on
two separate occasions, had been shown photographic arrays of sus-
pects in which only the defendant's photograph was repeated, where
there was no allegation that the initial array was in any way suggestive
and, apart from the reappearance of a dissimilar photograph of the
defendant in the second array, he was not singled out by the police in
any manner.   [167-172]

No error appeared in a judge's denial of a criminal defendant's motion to
.suppress incriminating statements made by him in the course of casual
conversation with his cellmates at a time when he was experiencing
drug withdrawal symptoms, where the evidence warranted the judge's
findings that, when the defendant made the damaging statements, he
was not so influenced by drugs he had taken the previous day that he
lacked understanding of what he was saying, that he was rational and
aware of his surroundings, the persons with him, and their respective
roles, and that, therefore, his statements were voluntarily made.
[172-178]

The holding of this court in *Commonwealth* v. *Tavares,* 385 Mass. 140,
150, cert. denied, 457 U.S. 1137 (1982), extending the applicability of
the Massachusetts "humane practice" to admissions as well as full con-
fessions, is to be applied prospectively.   [179-183]

On a motion to suppress, as the product of a police officer's allegedly ille-
gal search of a motel room registered to a criminal defendant, a denim
jacket subsequently found by a chambermaid in the room and which

was turned over to the police, the evidence warranted the conclusion that, at the time of the police officer's search, the defendant had abandoned the room, and that the defendant therefore had no constitutionally protected privacy interest in the room. [183-186]

A judge, after granting discovery to a criminal defendant, acted consistently with Mass. R. Crim. P. 14 (a) (3) in ordering the reciprocal production of a report prepared by the defendant's ballistics expert as well as a defense investigator's report describing interviews with witnesses and did not, as claimed by the defendant, violate either rule 14 or his right to effective assistance of counsel under the Sixth Amendment to the Federal Constitution by compelling him to disclose work product. [186-188]

The fact that, in conducting hypnosis of two witnesses prior to their testimony at a criminal trial, the police did not fully comply with the guidelines for witness hypnosis suggested by this court in *Commonwealth* v. *A Juvenile*, 381 Mass. 727, 732 n.8 (1980), a case decided subsequent to these particular hypnotic sessions, did not entitle the defendant to a new trial on the ground that testimony of the two witnesses based on their prehypnotic memories should have been excluded from evidence. [188-189]

A criminal defendant had no standing to contend that, because his wife was not advised at the time of her grand jury appearance that she had a statutory privilege not to testify against him, the prosecution was precluded from using that testimony to impeach her testimony at trial. [189-191]

The judge presiding at a seven-week criminal trial did not patently abuse his discretion in refusing the request of defense counsel, made on a Thursday at approximately 3:15 P.M., to postpone closing arguments and the jury charge until the following morning rather than concluding the trial during the late afternoon and evening hours. [191-192]

INDICTMENT found and returned in the Superior Court Department on September 5, 1980.

The case was tried before *Simons, J.*

*Conrad W. Fisher* for the defendant.

*David S. Ross,* Assistant District Attorney, for the Commonwealth.

ABRAMS, J. The defendant, Emilian Paszko, appeals from his conviction of murder in the first degree. Paszko's principal allegations of error are (1) the admission of out-of-court photographic identifications by three witnesses and the admission of an in-court identification by one of the wit-

nesses, (2) the admission of the defendant's statements to his cellmates, (3) the failure to instruct the jurors on the voluntariness of the defendant's statements, (4) the admission of a denim jacket, (5) the scope of the order of reciprocal discovery, (6) the admission of testimony by two witnesses based on their prehypnotic memories, (7) the questioning of Cheryl Paszko, his wife, before the grand jury without informing her of her privilege not to testify and the impeachment of his wife at trial with private conversations, and (8) the timing of the closing arguments and instructions to the jury.[1] We conclude that there is no reversible error, and no substantial likelihood of a miscarriage of justice. G. L. c. 278, § 33E. Therefore, we affirm Paszko's conviction and decline to exercise our power under G. L. c. 278, § 33E, in favor of the defendant.

We summarize the facts.[2] On June 8, 1980, a customer of Merrigan's Pharmacy in Easthampton alerted the Easthampton police that the drugstore was unattended. Responding to the call, the police arrived at Merrigan's around 11:50 A.M. and found Leslie A. Zive, the pharmacist and owner, lying at the bottom of the cellar stairs. Zive was dead. A cabinet containing Schedule II narcotic drugs[3] was found open and empty. An audit established that numerous Schedule II drugs were missing. The cause of Zive's death was a .22 caliber gunshot wound in the head.

The case against the defendant was circumstantial. The evidence implicating the defendant in the shooting included statements made by him before and after the date of the

---

[1] In the appendix, there is a brief discussion of the many other issues.

[2] Other facts will be described in the context of the discussion of particular issues raised on appeal.

[3] General Laws c. 94C, § 3, as amended by St. 1972, c. 806, § 8, defines Schedule II drugs as follows:

"(A) The drug or other substance has a high potential for abuse.

"(B) The drug or other substance has a currently accepted medical use in treatment in the United States or a currently accepted medical use with severe restrictions.

"(C) Abuse of the drug or other substances may lead to severe psychological or physical dependence."

crime; eyewitness testimony placing a person matching the defendant's description in two nearby pharmacies on the date of the crime; and a .22 caliber black semi-automatic Ruger pistol, ballistically linked to a shell casing found at Merrigan's, that was recovered after the defendant's sister-in-law led police to a site in Vermont where, according to her, the defendant had hidden the weapon two days after Zive's death.[4]

1. *Admissibility of identifications.* On the morning of the shooting, George O'Leary, the owner of Tremblay's Pharmacy in Florence, saw a stranger wearing blue denim pants, a denim jacket, and a yellow T-shirt, enter the drugstore at 10:40 A.M. The stranger had an unshaven face, and walked with a pronounced limp in the right leg. The owner was suspicious of the individual, and in order not to be left alone with him, kept a customer waiting until the stranger departed, whereupon the owner immediately called the police. Charles Curtin, the proprietor of the Cottage Pharmacy in Easthampton, saw a man with a dungaree jacket, a colorful cap, facial hair of a few days' growth, and a bad limp in the right leg in Curtin's drugstore shortly after 11 A.M. Jean Washington, a Cottage Pharmacy employee, also saw the man and corroborated Curtin's description.[5] Washington watched the stranger after he left and observed him get in a brown automobile. Prior to trial, the three witnesses sep-

---

[4] The judge's denials of the defendant's motions for a required finding of not guilty are not contested on appeal. We deem the issue waived. See *Commonwealth* v. *Cundriff*, 382 Mass. 137, 151 n.22 (1980), cert. denied, 451 U.S. 973 (1981). Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975). We add that the evidence implicating the defendant was overwhelming.

[5] The stranger's physical appearance and attire, as described by O'Leary, Curtin, and Washington, was in most aspects identical to that of the defendant, as described by witnesses who saw him during the days immediately preceding the shooting.

Hospital records indicating that the defendant was treated for a head laceration on May 31, 1980, were introduced at trial. Witnesses differed whether scars and stitches were visible on the defendant's forehead, around the time of the shooting. O'Leary, Curtin, and Washington did not recall seeing any markings on the stranger's forehead.

arately picked out photographs of the defendant as resembling the man seen in the drugstores, but did not make a positive identification of the defendant. Curtin made an in-court identification of the defendant as the person he saw on the morning of June 8, 1980.

The defendant moved to suppress any reference at trial to the three witnesses' out-of-court photographic identifications of the defendant as the man who had visited pharmacies near Merrigan's on the date Zive was killed. The defendant claims error in the judge's ruling admitting evidence of these pretrial identifications as well as the in-court identification by Curtin.

We set forth the judge's findings, amplified by the undisputed testimony at the suppression hearing. On June 8, 1980, O'Leary called the police after the stranger departed from Tremblay's. On the same day, after Zive's body was found, O'Leary gave a description to the police. He was then shown an array of seven color photographs of young white males with facial hair. A photograph depicting the defendant with long straight hair and a mustache was included, but O'Leary did not select that or any other photograph in this initial array. The next day, O'Leary was shown seven black and white photographs of young white males with facial hair, including a photograph of the defendant that differed from the color photograph in the first array, in that the defendant looked older, had curly hair, had a beard in addition to the mustache, and wore an earring in one ear.[6] The defendant was the only person pictured in both arrays. O'Leary selected the defendant's photograph as "most like the person I saw in my store earlier." On the evening of June 8, after hearing a report of Zive's death, Washington called the police and described the man she had seen. Shortly thereafter, she was shown the black and white photographic array. Washington chose the de-

---

[6] There are minor inaccuracies in the description of the photographic arrays contained in the judge's written findings. Since nothing turns on the judge's description of the pictures, we describe the arrays (which are before us as exhibits) without regard to the judge's inaccurate description.

fendant's photograph, stating, "This one looks the most like the one." The next day, she picked the defendant's photograph from the colored array, again stating that it was most representative of the man in the pharmacy. Washington noted that only the defendant's picture appeared in both arrays. Curtin was also shown the two arrays on separate occasions, subsequent to his observation of the man in his drugstore and, likewise, picked the defendant's photograph from each array as being closest to his recollection of that person. At trial, Curtin said that he told the police, "This is the man," but later admitted his identification may not have been so unequivocal. There was no evidence that the witnesses received any prompting from police at the time they made their selections. All three witnesses were able to select the defendant's photographs from the two arrays[7] at the April 15, 1981, suppression hearing.

The defendant argues that the inclusion of a photograph of him in each of the two photographic arrays displayed to the witnesses, whereas no other suspect was considered in both arrays, tainted the out-of-court identifications, and Curtin's in-court identification, so severely as to mandate their suppression. We do not agree. In *Simmons* v. *United States*, 390 U.S. 377 (1968), the Supreme Court noted that the danger of misidentification "will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized" (footnote omitted). *Id.* at 383. Nonetheless, duplication of a defendant's photograph in one or more arrays has not been held sufficient by itself to compel exclusion of a resulting identification. See *Commonwealth* v.

---

[7] There was conflicting evidence both at the suppression hearing and at trial with respect to whether O'Leary and Curtin were shown two or three photographic arrays, and with respect to whether O'Leary selected a photograph of the defendant at the initial array. The judge's resolution of the discrepant testimony on these issues is not clearly erroneous, and we therefore accept his findings for purposes of review. *Commonwealth* v. *Day*, 387 Mass. 915, 919 (1983).

*Kostka,* 370 Mass. 516, 523-524 (1976) (witness shown a dozen photographs including two of the defendant); *Commonwealth v. Mobley,* 369 Mass. 892, 896-897 (1976) (witness shown six photographs including one of the defendant, then shown second array including photograph of the defendant committing unrelated robbery); *Commonwealth v. Avery,* 12 Mass. App. Ct. 97 (1981) (defendant pictured in three of eighteen photographs); *Commonwealth v. LaPierre,* 10 Mass. App. Ct. 641 (1980) (defendant's photograph contained in three successive arrays); *Commonwealth v. Rodriguez,* 6 Mass. App. Ct. 738, 747 (1978), rev'd on other ground but approved in relevant part, 378 Mass. 296, 305-306 (1979) (no error in failure to suppress second array in which witness selected defendant's photograph but made *no positive identification following initial array with same* result); *United States v. Eatherton,* 519 F.2d 603 (1st Cir.), cert. denied, 423 U.S. 987 (1975) (witness shown multiple arrays, each including defendant's photograph); *United States v. Bowie,* 515 F.2d 3 (7th Cir. 1975) (witness selected defendant's picture from array of five black and white photographs, then from array of six color photographs; defendant only suspect featured in both arrays). But see *United States v. Mears,* 614 F.2d 1175 (8th Cir.), cert. denied, 446 U.S. 945 (1980) (improper to include two pictures of defendant in array of seven photographs). Rather, the admissibility of identifications obtained in such circumstances is to be determined with reference to "the totality of the circumstances" of the challenged episode of identification. *Commonwealth v. Botelho,* 369 Mass. 860, 867 (1976), quoting *Stovall v. Denno,* 388 U.S. 293, 302 (1967).

In the case we review, there is no allegation that the initial array of seven photographs was in any way suggestive. Cf. *United States v. Sanders,* 479 F.2d 1193, 1197 (D.C. Cir. 1973). Nor, apart from the reappearance of a dissimilar photograph of the defendant in the second array, was the defendant singled out in any manner. Cf. *United States v. Gambrill,* 449 F.2d 1148 (D.C. Cir. 1971). Although the repeated appearance of the defendant in the two photo-

graphic arrays is susceptible to criticism, "there was no passing or near passing of the constitutional boundary into fatal suggestiveness." *Commonwealth* v. *Cincotta*, 379 Mass. 391, 397 (1979).

Curtin and Washington were consistent in refraining from positively identifying the defendant at both arrays, while maintaining that his photograph was the one most representative of the man they had seen. Their adherence to their reservations at the second array "indicate[s] that 'the police conduct was without significant effect.'" *Commonwealth* v. *Correia*, 381 Mass. 65, 79 (1980), quoting *United States* v. *Eatherton, supra* at 609. Although O'Leary's identification at the second array was similarly circumspect, the trial judge's finding that O'Leary had not selected the defendant's photograph during the initial display establishes a greater likelihood that his choice at the second array may have been influenced by the duplication. However, we have previously declined to adopt "a per se exclusionary rule condemning as constitutionally infirm all subsequent identifications of a defendant by any witness who had previously failed to select the defendant," *Commonwealth* v. *Lacy*, 371 Mass. 363, 369 (1976), and find no unconstitutional suggestiveness where, as here, there were substantial differences between the two photographs, and the witness was able to make an identification from the more recent picture. See *Commonwealth* v. *LaPierre*, 10 Mass. App. Ct. 641, 644 (1980); *United States* v. *Bowie*, 515 F.2d 3, 7 (7th Cir. 1975).[8]

---

[8] The defendant argues that O'Leary's and Washington's out-of-court identifications were inadmissible hearsay because neither witness made an in-court identification. This contention is meritless. An out-of-court identification is admissible as substantive evidence even if the witness does not identify the defendant in court, provided the defendant's due process and confrontation rights are observed. *Commonwealth* v. *Torres*, 367 Mass. 737, 739 (1975). See *Commonwealth* v. *Repoza*, 382 Mass. 119, 130 n.5 (1980); *Commonwealth* v. *Fitzgerald*, 376 Mass. 402, 408 (1978). O'Leary's and Washington's out-of-court identifications were not the product of an impermissibly suggestive procedure, see *supra* at 168-171, and both witnesses were available at trial to be cross-examined as to their identifications. Cf. *Commonwealth* v. *Furtick*, 386 Mass. 477, 481 n.2 (1982).

In light of our conclusion that the pretrial identifications were not unduly suggestive, we perceive no defect in the trial judge's decision to permit in-court identifications by the witnesses. *Commonwealth* v. *Venios,* 378 Mass. 24, 29 (1979). *Commonwealth* v. *Kostka,* 370 Mass. 516, 524 (1976). Only Curtin made an in-court identification. To the extent that Curtin's in-court identification demonstrated greater certitude than did his photographic identifications, his previous reservations "were properly presented to the jury by defense counsel on cross-examination of the witness" and went to the weight of his testimony. *Commonwealth* v. *Correia,* 381 Mass. 65, 79 (1980). Other defects in the witnesses' descriptions of the stranger were for the jury to assess in determining the probative value of the identification testimony.[9] "The question raised by a motion to suppress identification testimony is not whether the witness was or might be mistaken but whether any possible mistake was or would be the product of improper suggestions made by the police." *Commonwealth* v. *Gordon,* 6 Mass. App. Ct. 230, 237 (1978). We conclude that there is no error in the denial of the defendant's motion to suppress these identifications.

2. *Voluntariness of the defendant's statements to cellmates.* The defendant filed a motion to suppress the admissions to shooting a pharmacist made to cellmates at a New York jail, alleging that such statements were involuntary. Because of logistical difficulties in simultaneously assembling all of the witnesses whose testimony was pertinent to the

[9] The trial judge also made detailed findings with respect to the witnesses' capacity to observe and recall the features of the man they saw on June 8, 1980. These findings are relevant to the "reliability" test enunciated in *Neil* v. *Biggers,* 409 U.S. 188, 199 (1972), and reaffirmed in *Manson* v. *Brathwaite,* 432 U.S. 98, 114 (1977). Although we have encouraged trial judges to make findings with reference to reliability, *Commonwealth* v. *Venios,* 378 Mass. 24, 28 (1979), and have indicated that we might follow that test, see *Commonwealth* v. *Cincotta,* 379 Mass. 391, 396 (1979), we have not yet explicitly adopted the *Biggers-Manson* standard. See *Commonwealth* v. *Correia,* 381 Mass. 65, 81 (1980). Because, after independent review, we uphold the trial judge's conclusion that the photographic arrays were not impermissibly suggestive, we again leave the decision of the applicability of the reliability test in this Commonwealth for another day.

motion, two out-of-State witnesses, cellmates Michael Le-
masters Webb and Michael Tomes, were permitted to testify
at trial before the judge conducted a voir dire on the volun-
tariness question and ruled on the motion.[10]   After hearing
the voir dire testimony of a third cellmate, Kenneth Raynor,
as well as that of the defendant and three police officers
who saw the defendant on June 19 and 20, 1980, the judge
denied the motion.

We summarize the judge's findings.   The defendant had
been a drug addict for several years before his arrest on June
19, 1980.   Prior to the automobile chase that culminated in
his arrest, he had consumed Valium and ingested morphine.
Although, according to his own testimony at the voir dire,
the defendant was not "high" at the time of the chase, he
acted irrationally at the scene of his arrest on the New York
Thruway, ignoring the instructions of the arresting police
officer, who was pointing a gun at the defendant.   The ar-
resting officer said the defendant appeared intoxicated and
disheveled, and had sunken bloodshot eyes.   Further, at the
scene of the arrest, the defendant, despite handcuffs, man-
aged to remove a vial from his jacket pocket and ingest an
unknown quantity of Valium.

In the early afternoon of June 19, the defendant was
transported to the Fredonia jail, where he began to exhibit
withdrawal symptoms, including shaking, vomiting, and
inability to eat.   The defendant said he was withdrawing

---

[10] The defendant argues that "this Court should adopt the rule, prophy-
lactic in nature, requiring a reversal when a voir dire is held after the jury
has been exposed to [potentially involuntary] statements."   We agree with
the defendant that, as a general rule, a judge should not admit potentially
involuntary statements in evidence prior to a voir dire.   In this case,
where the contested statements were made to out-of-State cellmates,
whose availability to testify was limited, rather than to police, we uphold
the judge's decision to permit the testimony in advance of the voluntari-
ness voir dire.   The judge's finding that the statements were voluntary ne-
gates any prejudice to the defendant as a result of the unorthodox proce-
dure.   *Jackson* v. *Denno*, 378 U.S. 368, 394 (1964).   *Commonwealth* v.
*Brady*, 380 Mass. 44, 52-53 (1980).   We emphasize, however, that only in
exceptional circumstances, present here, should witnesses be permitted to
testify before the jury in advance of a judicial determination of the volun-
tariness of the defendant's statements.

from morphine and heroin. Sores were apparent on his face and arms. The defendant continued to exhibit irrational behavior. However, during an interview with a detective, the defendant responded intelligently to questions and appeared capable of focusing on the subjects discussed in the course of the interview.[11] Because of his irrational behavior, the defendant was shackled for approximately four hours on June 19. The defendant was arraigned at 11 P.M. He appeared calm.

In the early hours of June 20, the defendant was placed in a large holding cell with several other prisoners awaiting court appearances. The following morning, the defendant was still experiencing withdrawal symptoms and discomfort,[12] and requested medical treatment to alleviate his withdrawal symptoms.[13]

During this period, in response to questions directed at him by one or more of his cellmates, the defendant made the incriminating statements that were the subject of the motion to suppress. Michael Lemasters Webb, a hitchhiker in the

[11] The detective stated that, when he first saw the defendant on June 19, the defendant was speaking incoherently but that he had "settled down somewhat" by the time of the interview. The defendant denied killing anyone and stated that, at the time he was arrested, he was returning to Massachusetts to "straighten things out." The interview terminated when the defendant asked for a lawyer. The defendant's statements at the interview were not encompassed in the motion to suppress.

[12] Tomes described the defendant as "fidgeting" and "nervous." Raynor testified that the defendant was shaking at the time he was put in the cell, fell off his bunkbed during the night, and yelled a lot during the morning. Officer Richard Lavalle, who came to New York on June 20 to make arrangements to return the defendant to Massachusetts, stated that when he saw the defendant, he appeared "very confused" and disoriented, and that he was advised by a sergeant at the jail not to transport the defendant on the twentieth, because the defendant was "in bad shape" and "very violent, paranoid, and in withdrawal."

[13] Raynor said that, on the morning of June 20, the defendant repeatedly asked for a doctor, that when a doctor came, the defendant requested drugs "for the pain," and that the doctor gave the defendant some medication to be applied to the defendant's sores, but did not dispense any drugs for the withdrawal symptoms. The defendant asked that he be placed in a hospital for detoxication, and said that he wanted "help to get me out of the hole, to get some treatment."

defendant's automobile who had been arrested and put in the holding cell, heard the defendant say, "I was robbing a pharmacist and he pulled a gun on me so I shot him in the head." Michael Tomes said that he heard someone in the holding cell claim to have killed a pharmacist in Massachusetts. Kenneth Raynor heard the defendant state that he had robbed a drugstore in Massachusetts, and that he had accidentally shot the pharmacist when the pharmacist reached for the defendant's gun as he was handing drugs to the defendant. The defendant subsequently told Raynor that he had not really shot the pharmacist. A fourth cellmate, John Bailey, who was called by the defense, stated that the defendant was "high" on drugs, had said that he was in jail for shooting a pharmacist, but had not admitted committing the crime. On cross-examination, Bailey stated that the defendant did say he had shot a man while robbing a pharmacy, but that, upon reflection, Bailey had concluded that the defendant meant to say only that he was accused of doing so.

During the same period, the defendant was aware of the possibility that he would be indicted in connection with the homicide of the pharmacist in Easthampton, and made statements exonerating Lemasters Webb, the hitchhiker who had been arrested along with the defendant at the time the defendant's car was stopped. The defendant, who acknowledged that he had been arrested on various prior occasions, and that he was familiar with the Miranda warnings, stated at the voir dire that he was aware of his right to remain silent at the time he was in the cell. The defendant denied that he had made incriminating statements.

There is no per se rule excluding as involuntary statements made during drug withdrawal, *United States* v. *Harden,* 480 F.2d 649, 651 (8th Cir. 1973); *United States* v. *Arcediano,* 371 F. Supp. 457, 466 (D. N.J. 1974); see *Commonwealth* v. *Fielding,* 371 Mass. 97, 112 (1976); *Buford* v. *United States,* 337 F.2d 439, 440 (7th Cir. 1964). However, when such statements are made to police officers, a heavy burden rests on the government to show that the defendant's

waiver of his constitutional rights, and subsequent confession, were voluntary. *United States* v. *Monroe*, 397 F. Supp. 726 (D. D.C. 1975). Cf. *Commonwealth* v. *Benoit*, 389 Mass. 411, 420 (1983); *United States* v. *Medina*, 552 F.2d 181 (7th Cir.), cert. denied, 434 U.S. 839 (1977); *United States ex. rel. Hayward* v. *Johnson*, 508 F.2d 322, 327-328 (3d Cir.), cert. denied, 422 U.S. 1011 (1975); *United States* v. *Poole*, 495 F.2d 115 (D.C. Cir. 1974), cert. denied, 422 U.S. 1048 (1975); *Ybarra* v. *United States*, 461 F.2d 1195 (9th Cir. 1972); *Maez* v. *United States*, 367 F.2d 139 (10th Cir. 1966) (statements not involuntary absent finding that they were made contemporaneously with manifestation of withdrawal symptoms). In *Commonwealth* v. *Fielding*, *supra*, we noted that had the defendants been suffering severe withdrawal symptoms, "their confessions might be subject to question on grounds of involuntariness," *id.* at 111, but, conceding that the defendants had been "troubled" by drug withdrawal, *id.*, we held that withdrawal in that case "did not impose such duress as to invalidate the confessions," *id.* at 112.[14] Had Paszko's statements been made in response to police interrogation, rather than in the course of casual conversation with cellmates, we might well be reluctant to uphold a finding of voluntariness. However, an assessment of "the totality of relevant circumstances," *Commonwealth* v. *Mahnke*, 368 Mass. 662, 680 (1975), cert. denied, 425 U.S. 959 (1976), leads us to the conclusion in this case that the defendant's statements were properly admitted.

In *Commonwealth* v. *Mahnke*, *supra*, we held that, under the law of this Commonwealth,[15] a judge must deter-

[14] We took note in *Fielding* of testimony indicating that the will to resist making incriminating statements during drug withdrawal "varies from person to person" and that "subjects withdrawing from heroin do not lose the capacity for rational thought and choice." 371 Mass. 97, 111 n.19 (1976).

[15] There is no Supreme Court precedent, or generally accepted Federal practice, from which we could conclude that, absent governmental complicity, the defendant's statements to private citizens may be held involuntary under the Federal due process clause as applied to the States by the Fourteenth Amendment. But see *United States* v. *Bernett*, 495 F.2d 943,

mine the voluntariness of statements "extracted by private coercion, unalloyed with any official government involvement." *Commonwealth* v. *Mahnke, supra* at 680. Because we conclude that the trial judge was warranted in finding the admissions were voluntarily made, we need not now decide whether *Mahnke,* which discussed "[s]tatements extracted by a howling lynch mob or a lawless private pack of vigilantes from a terrorized, pliable suspect," *id.* at 681, should be extended to cover statements made by a suspect who, though in a debilitated condition, is not induced, tricked, or coerced in any way by the private citizens to whom he conveys damaging information. See *Commonwealth* v. *Vazquez,* 387 Mass. 96, 101 n.9 (1982); *Commonwealth* v. *Brady,* 380 Mass. 44, 50 n.2 (1980).

The rationale underlying the inadmissibility of a statement extracted from a person who by dint of physical or mental impediments is incapable of withholding the information conveyed, "can without difficulty be articulated in terms of the unreliability of the [statement], the lack of rational choice of the accused, or simply a strong conviction that our system of law enforcement should not operate so as to take advantage of a person in this fashion." *Blackburn* v. *Alabama,* 361 U.S. 199, 207 (1960). The judge found that, when the defendant made the damaging statements, he "was not so influenced by any drugs he had taken the previous day that he lacked understanding of what he was saying to his cellmates." The judge also found that the defendant "was rational, aware of his surroundings and the persons

947, 970 (D.C. Cir. 1974); *United States* v. *Robinson,* 439 F.2d 553, 561 n.8 (D.C. Cir. 1970). We reject the defendant's contention that the police's "placement of the defendant in a cell with others when he was in a visibly disoriented state" constitutes State action to which the defendant's damaging statements may be traced; it would be mischievous to hold the due process clause applicable to the defendant's statements because the police did not place him in solitary confinement. Although the deterrence of illicit conduct producing involuntary statements is a factor in the exclusion of such statements, see, e.g., *United States* v. *Bernett, supra* at 951 (Robinson, J., dissenting in part), that objective is not implicated where neither the police nor the defendant's cellmates contributed to the defendant's condition.

with him and what their respective roles were." The record supports these findings.

There is no evidence of express or implied threats or promises by the defendant's cellmates, or of mental impairment so severe as to impugn the reliability of the defendant's statements. See *Commonwealth* v. *Vazquez, supra*; *Commonwealth* v. *Morey*, 1 Gray 461, 462-463 (1854). Nor is this a case presenting a substantial likelihood that the defendant's admissions were obtained as a result of a debilitating condition that left him "devoid of his normal will to protect himself and rendered indifferent to protect himself." *Pea* v. *United States*, 397 F.2d 627, 634 (D.C. Cir. 1967). The defendant, in fact, asked for an attorney and terminated his conversation with police apparently concluding that it was not in his interest to speak with police in the absence of an attorney. The decision by the defendant not to speak to police without legal advice but to speak to cellmates and acquaintances[16] indicates an ability to choose between speaking and remaining silent. Such a choice is consistent with a rational intellect and indicates that the defendant's will was not overborne by his withdrawal symptoms. We believe that the judge could properly conclude that the defendant "took the risk that whatever he said to others than the police might be told to the police." *Commonwealth* v. *Martin*, 357 Mass. 190, 193 (1970).[17]

---

[16] There was evidence that the defendant had discussed the crime on prior occasions. One acquaintance of the defendant stated that on June 6, 1980, the defendant asked him whether he wanted to assist the defendant in robbing a drugstore. On that occasion, the defendant stated that he intended to "leave no witnesses."

[17] The defendant also claims that a mistrial was required after defense counsel, on cross-examination, elicited from Kenneth Raynor a statement that the defendant had told Raynor that the defendant "did time in Walpole." The judge struck the response and instructed the jury to disregard the statement. Any prejudice to the defendant was further dispelled by a stipulation read to the jury and referred to in the defendant's closing argument that "at no time prior to June 20, 1980 [when the defendant spoke to Raynor] was [Paszko] confined or sentenced to Walpole State Prison." There was no error in the denial of the motion for mistrial. See *Commonwealth* v. *Chubbuck*, 384 Mass. 746 (1981); *Commonwealth* v. *Lacy*, 371 Mass. 363, 365 (1976).

There is likewise no merit in the defendant's allegation that the testimony of Richard Grace required a mistrial. Grace stated that he drove

3. *Failure to instruct jury on voluntariness.* The defend-
ant asserts reversible error in the trial judge's failure to com-
ply with our "humane practice"[18] by instructing the jury to
disregard the defendant's admissions to cellmates if the jury
determined the admissions were involuntary. See *Com-
monwealth* v. *Harris,* 371 Mass. 462, 469 (1976).

The defendant's trial took place before our decision in
*Commonwealth* v. *Tavares,* 385 Mass. 140, 150, cert. de-
nied, 457 U.S. 1137 (1982). In that case, we extended the
applicability of the humane practice to admissions[19] as well
as full confessions. The viability of the defendant's claim of
error is thus linked to the question whether our holding in
*Tavares* has retroactive effect.[20]

We have recently examined the factors pertinent to wheth-
er a decision should be applied to trials preceding the date
on which it was rendered. We noted in *Commonwealth* v.
*Breese,* 389 Mass. 540 (1983), that "[d]ecisional law usually

---

the defendant from Chicopee to Holyoke two days before the shooting.
According to Grace, the defendant stated that he "had to leave town."
Asked by the prosecutor whether the defendant had said "anything fur-
ther," Grace responded, "All he said, he had a warrant out for his arrest."
The defendant objected; the judge immediately struck the answer and in-
structed the jury to disregard Grace's response. The judge did not abuse
his discretion in denying a mistrial. See *Commonwealth* v. *Chubbuck,*
*supra; Commonwealth* v. *Lacy, supra.*

[18] The "humane practice" is only applicable where there is a "live issue"
with regard to the voluntariness of a statement. *Commonwealth* v.
*Brady,* 380 Mass. 44, 54 (1980). The Commonwealth concedes the exist-
ence of a live issue of voluntariness at trial.

[19] It is undisputed that the defendant's statements are admissions, not
confessions. See *Commonwealth* v. *Haywood,* 247 Mass. 16, 18 (1923).

[20] In *Commonwealth* v. *Vazquez,* 387 Mass. 96 (1982), we reversed a
conviction at a trial apparently conducted before our decision in *Com-
monwealth* v. *Tavares, supra,* because of the trial judge's failure to in-
struct the jury to consider the voluntariness of admissions made by the de-
fendant to police officers. Noting that the statements were critical both
on the issue of the defendant's guilt and with regard to his criminal re-
sponsibility, we concluded that the failure to instruct the jury created a
substantial risk of a miscarriage of justice and reversed pursuant to G. L.
c. 278, § 33E. The issue of *Tavares'* retroactivity was not before us in
*Vazquez,* however, and we did not decide it.

is retroactive. When a decision announces a new rule, however, the issue arises whether it will be applied only prospectively." *Id.* at 541. *Commonwealth v. Tavares, supra,* announced a new rule concerning the applicability of the humane practice to admissions. The exclusion of admissions from the scope of the humane practice dates from the early part of the century. See *Commonwealth v. Jokinen,* 257 Mass. 429, 430 (1926); *Commonwealth v. Haywood,* 247 Mass. 16, 18 (1923). In 1975, we characterized this distinction between admissions and confessions as "settled Massachusetts law." *Commonwealth v. Mahnke,* 368 Mass. 662, 679 n.24 (1975). Although we subsequently questioned the distinction without abolishing it, see *Commonwealth v. Garcia,* 379 Mass. 422, 432 (1980); *Commonwealth v. Fournier,* 372 Mass. 346, 348 (1977), we cannot say that judges conducting trials prior to *Commonwealth v. Tavares,* were unjustified in disregarding these dicta and adhering to settled law. Because *Tavares* constituted a "'clear break with the past,'" we pursue the question whether *Tavares* should have prospective application only. See *Commonwealth v. Breese, supra* at 546.

Our inquiry requires consideration of three criteria: "(a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards." *Commonwealth v. Breese, supra* at 548, quoting *Stovall v. Denno,* 388 U.S. 293, 297 (1967). The initial, and often determinative, criterion necessitates an evaluation whether "the major purpose of new . . . doctrine is to overcome an aspect of the criminal trial that substantially impairs its truth-finding function and so raises serious questions about the accuracy of guilty verdicts in past trials." *Ivan V. v. City of New York,* 407 U.S. 203, 204 (1972), quoting *Williams v. United States,* 401 U.S. 646, 653 (1971). Accord *Commonwealth v. Breese, supra* at 548.

In evaluating whether the nonapplication of the "humane practice" requirements to admissions introduced in trials

preceding *Tavares* "raises serious questions about the accuracy of guilty verdicts" in those trials, we are mindful that admissions do not have the evidentiary impact or importance of full confessions. Whereas a confession is an assertion of guilt and is sufficient by itself to sustain a conviction, the term "admission" incorporates a spectrum of statements ranging from those of attenuated relevance to the prosecution's case, see *United States* v. *Tarr,* 589 F.2d 55, 62 (1st Cir. 1978), to those that are highly probative, though not conclusive, of the defendant's guilt. Given that an admission must be supported by independent evidence of a defendant's guilt, see *Commonwealth* v. *Haywood, supra,* there is a decreased risk that the accuracy of a conviction is threatened by the potentiality that the admission was "involuntary." Because of this diminished likelihood of erroneous verdicts, constitutionally mandated inquiries into voluntariness have not been held applicable to admissions. See *Stein* v. *New York,* 346 U.S. 156, 162-163 n.5 (1953), overruled on other grounds, *Jackson* v. *Denno,* 378 U.S. 368, 391 (1964); *United States* v. *Tarr, supra.* But see *People* v. *Haydel,* 12 Cal. 3d 190, 197 (1974).[21]

Although in *Tavares* we extended to admissions the nonconstitutional protections afforded by our humane practice in recognition that in some circumstances an admission may exert an influence on a jury approximating that of a confession, we are not persuaded that the likelihood of erroneous verdicts in past cases is such as to outweigh other factors

---

[21] The constitutional requirement that a judge determine the voluntariness of a statement before admitting it in evidence was imposed in *Jackson* v. *Denno, supra,* which involved a confession. We have found no subsequent Supreme Court or other Federal court decision holding the *Jackson* v. *Denno* requirements applicable to admissions. Nevertheless, we believe that such hearings should be held to avoid constitutional attacks on convictions.

We note that the trial judge, perhaps out of an abundance of caution, conducted a hearing in compliance with *Jackson* v. *Denno,* and determined that the defendant's statements were voluntary. This "initial screening by the judge is the 'basic determination safeguarding the accused.'" *Commonwealth* v. *Tavares, supra* at 152, quoting *Clifton* v. *United States,* 371 F.2d 354, 362 (D.C. Cir. 1966) (Leventhal, J., concurring), cert. denied, 386 U.S. 995 (1967).

counseling against retroactive application of *Tavares*. We have already noted the justified reliance of trial judges on the admission-confession dichotomy in conducting trials prior to *Tavares*. Moreover, "although we cannot predict how many defendants convicted before [*Tavares*] . . . would seek to attack their convictions on the ground that the trial judge erred in failing to instruct the jury in accordance with [*Tavares*], we are confident that the number of such attacks and resulting appeals and retrials would be enough to burden substantially the administration of criminal justice in the Commonwealth." *Commonwealth* v. *Breese, supra* at 550.

We conclude that admissions introduced at trials conducted prior to our decision in *Tavares* are not subject to the "humane practice."[22] Consequently, there was no error in the judge's failure to instruct the jury to disregard Paszko's statements to cellmates if they determined such statements to be involuntary.

Although we decide that jury consideration of the voluntariness of the defendant's admissions to private citizens was not necessary in the instant case, we leave open the possibility that in other circumstances statements made to private citizens may sufficiently implicate voluntariness concerns as to require jury consideration. See *Commonwealth* v. *Vazquez*, 387 Mass. 96, 101 n.9 (1982); *Commonwealth* v. *Brady*, 380 Mass. 44, 50 n.2 (1980). The better practice is to treat the defendant's statements to private citizens as if they were statements to police, and to conduct a voir dire on

---

[22] In response to a question submitted by the jury during deliberation, the judge gave an instruction that, if the jurors found that the defendant was intoxicated when he made his admission, they could "accept such an admission fully . . . disregard it entirely, or . . . give it such weight as you feel it deserves under the circumstances as you find·them." Since this instruction neither focused on the potential effects of the defendant's drug withdrawal nor alerted the jury that they *must* disregard any admission they found involuntary, it would be insufficient to discharge the judge's duty under the humane practice. Because we conclude that the judge was under no obligation to instruct on voluntariness, however, the defendant suffered no prejudice from this instruction.

the voluntariness of the statements.  If the judge determines that the statements are voluntary, the issue of voluntariness should be resubmitted to the jury for consideration.

4. *The denim jacket.*  The defendant moved to suppress, as the product of an illegal search, a denim jacket found in one of several motel rooms he inhabited during the eleven-day interval between the date the pharmacist was shot and the date the defendant was arrested in New York.  It should be recalled that the stranger who visited the two pharmacies near Merrigan's wore a denim jacket.  After a hearing the judge denied the motion.

The judge's findings, along with the undisputed testimony at the hearing, establish the following.  On June 11, 1980, the defendant registered under a former neighbor's name at the Bedford Motel in Bedford Township, Michigan.  After occupying a single room for two days, the defendant requested a room with kitchen facilities.  On June 13, the defendant prepaid a week's stay in an efficiency unit.  The rental expired at 11 A.M. on June 20, 1980.  On June 18, two motel employees observed the defendant digging near bushes located outside his room.  The defendant turned around and saw that he had been spotted.  Later that day, the defendant registered under his brother's name at a motel one mile from the Bedford Motel.  At 8 P.M., on June 18, the defendant left the Bedford Motel, taking with him his personal belongings and clothing.  Later that night, the defendant registered and slept in a motel in Pennsylvania.  At the time, he carried two or three suitcases filled with his belongings.

On June 19, the defendant was arrested on the New York Thruway.  The defendant was driving in an eastward direction.  The defendant had in his possession a key to the efficiency unit at the Bedford Motel.  Later that day, a police officer was asked to assist in a search for the defendant's gun.  The officer went to the motel, and with the manager's consent, conducted a warrantless search of the room the defendant had occupied.  The officer seized some syringes and

drugs,[23] but left behind a jacket he saw hanging on the bedroom door.

On June 20, after the defendant's rental period had expired, the motel manager instructed a maid to strip the defendant's room. The removal of items from a vacated room was standard procedure. At the time of the stripping, the drawers and closets in the room were empty. On top of a bureau, the maid found a denim jacket. In addition, the maid found a man's wristwatch on a table, and a substantial supply of food and groceries in the kitchen. The maid gave the jacket and wristwatch to the motel manager. At some point before the grand jury returned an indictment against the defendant, the manager turned over the jacket to the police.

The judge found that, at the time the jacket was seized, the room was abandoned, and that the defendant therefore had no constitutionally protected privacy interest in the premises.[24] The defendant argues that the room was not abandoned at the time the police officer conducted the warrantless search, and that the maid's subsequent seizure of the jacket was the tainted fruit of an illegal search. We do not agree.

Although the judge did not specify in his findings at what point the defendant abandoned the room, the evidence warrants a conclusion that the defendant did so when he departed on June 18, and that there was no illegality in the officer's subsequent search. "Abandonment is primarily a question of intent, and intent may be inferred from words spoken, acts done, and other objective facts." *United States* v. *Colbert*, 474 F.2d 174, 176 (5th Cir. 1973). The defend-

---

[23] The seizure of these items is not at issue.

[24] At the suppression hearing, the defendant denied ownership of the denim jacket. There was, however, ample evidence that the jacket was removed from the motel room which the defendant had rented. See *Commonwealth* v. *Franklin*, 376 Mass. 885, 900 (1978). If the defendant had a reasonable expectation of privacy in the motel room, see *Katz* v. *United States*, 389 U.S. 347 (1967), he had standing to challenge the introduction in evidence of an item seized as a result of an illicit search of that room.

ant's registration at a nearby motel on the same day he was detected digging in the Bedford Motel's garden, supports the inference that the defendant believed he would be in jeopardy if he remained at the Bedford after June 18. This inference derives further support from the defendant's removal on June 18 of all his personal effects, with the exception of the jacket and wristwatch, from the Bedford Motel room. The jacket and the wristwatch "could have been easily overlooked by [the] defendant . . . and do not, therefore, demonstrate that the room was not abandoned." *United States* v. *Akin*, 562 F.2d 459, 464 (7th Cir. 1977), cert. denied, 435 U.S. 933 (1978). Nor is the defendant's failure to take with him perishables and other foodstuffs inconsistent with abandonment. The defendant's journey to Pennsylvania on June 18, and his interrupted drive on June 19, when, according to the defendant, he was headed for New York City, refute an intent to return to the motel room before checkout time on June 20. Although the defendant testified at the suppression hearing that he did intend to return to the Bedford Motel, the trial judge was not required to believe this testimony. *Commonwealth* v. *Hooks*, 375 Mass. 284, 289 (1978). The fact that the defendant retained a property interest in the room until his one-week rental period expired on June 20 does not preclude the conclusion that he abandoned the room on June 18. *United States* v. *Wilson*, 472 F.2d 901, 903 (9th Cir.), cert. denied, 414 U.S. 868 (1973); *Feguer* v. *United States*, 302 F.2d 214, 249 (8th Cir.) (Blackmun, J.), cert. denied, 371 U.S. 872 (1962). See *Abel* v. *United States*, 362 U.S. 217, 241 (1960).

Even if the defendant did not abandon the room on June 18, the motion to suppress was properly denied. "[A] guest in a hotel or motel loses his reasonable expectation of privacy and consequently any standing to object to 'an unauthorized search of the premises' after his rental period has terminated." *United States* v. *Jackson*, 585 F.2d 653, 658 (4th Cir. 1978), and cases cited. Assuming that the police officer's warrantless search of the room on June 19 violated the defendant's constitutionally protected privacy interest,

suppression of the jacket, seized after that interest had ex-
pired was not required unless the seizure was the "fruit of
the unwarranted intrusion." *Wong Sun* v. *United States,*
371 U.S. 471, 485 (1963). Because the removal by motel
employees of items left in a vacated room was standard pro-
cedure, cf. *Commonwealth* v. *Leone,* 386 Mass. 329, 332
(1982); *Commonwealth* v. *Storella,* 6 Mass. App. Ct. 310,
313 (1978), there is no basis for concluding that the defend-
ant's jacket would not have been discovered absent the offi-
cer's search. We conclude that the Commonwealth satisfied
its burden of establishing an independent source for the dis-
covery of the evidence. *Wong Sun* v. *United States, supra*
at 488.[25] The motel manager's decision to make available to
the police the lawfully recovered evidence was "merely [a]
praiseworthy act of citizen cooperation." *Commonwealth*
v. *Storella, supra.*

5. *The order for reciprocal discovery.* The judge, over
defense counsel's objection, ordered the production of a re-
port prepared by the defendant's ballistics expert as well as
a defense investigator's report describing interviews with
various witnesses, including Leo St. Lawrence. These re-
ports were used at trial by the prosecution to impeach the
testimony of the defense expert and of Leo St. Lawrence.
The defendant claims that the discovery order compelled
him to disclose work product, in violation of Mass. R. Crim.
P. 14, 378 Mass. 874 (1979), and the defendant's right to ef-
fective assistance of counsel under the Federal and State
Constitutions. We disagree.

---

[25] A police officer cannot, of course, circumvent Fourth Amendment re-
strictions by leaving behind items discovered during an unlawful search,
and then using his knowledge of the existence of those items to request a
private person who would not otherwise have done so to recover the
items. In cases where the police acquire knowledge of the existence of evi-
dence through an unlawful search preceding the discovery of the evidence
by another party, the prosecution bears a heavy burden to establish the in-
dependent nature of the recovery of the evidence. Assuming arguendo
that the officer's search of the room was unlawful, the Commonwealth
met its burden of establishing that the acquisition of the evidence was in-
dependent of the officer's search.

Prior to trial, the prosecution turned over to the defense the report of the prosecution's ballistics expert. The defendant does not contest the government's assertion that grand jury testimony, written statements, and police report summaries of oral statements by various witnesses, including Leo St. Lawrence, were also produced for the defendant's use. The judge acted consistently with Mass. R. Crim. P. 14 (a) (3) in ordering the reciprocal production[26] of the defense ballistics report (a report of "scientific tests or experiments") and the investigator's report (containing "statements of persons").[27] The defendant's characterization of these reports as work product is erroneous, as they contain neither "legal research, opinions, theories, or conclusions of the adverse party or his attorney and legal staff" nor "statements of a defendant, signed or unsigned." Mass. R. Crim. P. 14 (a) (5), 378 Mass. 874, 876 (1979).

The defendant's reliance on the broader definition of work product under Federal law is misplaced. See *United States* v. *Nobles*, 422 U.S. 225, 238-240 (1975) (defense investigator's report containing witness statements treated as work product, but privilege waived with respect to matters covered by investigator's trial testimony). The work product doctrine is a creature of public policy, not constitutional compulsion. Rule 14 of the Massachusetts Rules of Criminal Procedure preserves the "core" of the work product doctrine by "shelter[ing] the mental processes of the attorney," *United*

---

[26] The defendant's claim that discovery was improper because there was no discovery order in effect is without merit. The judge took no action when the prosecution filed its motion for reciprocal discovery because at the time the defense represented to the judge that it had no discoverable material. The judge implicitly granted the motion by ordering production when it became apparent that the defense was in possession of discoverable matter.

[27] The ballistics expert and the investigator both testified at trial. Their signed reports were discoverable statements under Mass. R. Crim. P. 14 (d) (1), 378 Mass. 874 (1979), and Mass. R. Crim. P. 23 (a) and (e), 378 Mass. 893 (1979). Discovery of Leo St. Lawrence's statements, contained in the investigator's report, was also appropriate under Mass. R. Crim. P. 14 (a) (2), and Mass. R. Crim. P. 23 (a) (4) and 23 (e), 378 Mass. 893 (1979).

*States* v. *Nobles, supra* at 238, but, unlike the Federal doctrine, favors liberal discovery by excluding statements of witnesses other than the defendant and nonlegal reports from the definition of work product.[28] The policy of our rules is that the availability of statements of nonparty witnesses gathered by an adversary serves a truth-enhancing function, see *Wardius* v. *Oregon,* 412 U.S. 470, 474 (1973), that outweighs any resulting inconvenience or potential disincentive to lawyers who obtain and preserve such statements in written form. See *Ward* v. *Peabody,* 380 Mass. 805, 817 (1980). Cf. *Hickman* v. *Taylor,* 329 U.S. 495, 510-511 (1947). This public policy determination is consistent with the constitutional right to effective assistance of counsel. "The Sixth Amendment does not confer the right to present testimony free from the legitimate demands of the adversarial system; one cannot invoke the Sixth Amendment as a justification for presenting what might have been a half-truth." *United States* v. *Nobles, supra* at 241. Documents similar to those the defendant argues should be unavailable to the prosecution were made available to defense counsel for preparation, and used by defense counsel for impeachment purposes. The defendant is not constitutionally entitled to a discovery system that operates only to his benefit.

6. *The admission of the prehypnotic testimony of two witnesses.* In the course of the investigation of the pharmacist's shooting the police hypnotized four people, including Jean Washington and Barbara Bushey. The judge permitted Washington and Bushey to testify for the Commonwealth after obtaining an agreement from the prosecutor that only testimony based on their prehypnotic memories would be elicited. Although the trial took place before our decision in *Commonwealth* v. *Kater,* 388 Mass. 519 (1983), the judge presciently precluded the presentation of any hypnotically

---

[28] Under Federal law, such statements are protected by a qualified privilege, *United States* v. *Nobles, supra* at 239, surmountable upon a showing of necessity. See *Hickman* v. *Taylor,* 329 U.S. 495, 511-512 (1947). Mass. R. Crim. P. 14 dispenses with this presumptive protection.

aided testimony in compliance with our holding in *Kater* that such testimony, if uncorroborated, is inadmissible.

The defendant contends that, because the police did not fully comply with the procedures for witness hypnosis suggested in *Commonwealth* v. *A Juvenile*, 381 Mass. 727, 732 n.8 (1980), Washington's and Bushey's testimony based on prehypnotic memory should also have been excluded. We do not agree. We note initially that the hypnosis of these two witnesses took place before *Commonwealth* v. *A Juvenile* was decided, and that the police did not have the benefit of the guidelines proposed therein at the time the hypnotic sessions were conducted. Moreover, although in *Commonwealth* v. *Kater*, *supra*, we stated that the *Juvenile* procedures should be applied in a flexible manner at hypnotic sessions subsequent to the date of decision of *Kater*, we explicitly declined to "impose any guidelines on the admissibility of testimony based on the prehypnotic memory of a witness hypnotized before the date of this opinion." *Commonwealth* v. *Kater*, *supra* at 521. The fact that the *Juvenile* standards were not fully met does not, therefore, entitle the defendant to a new trial.

7. *Impeachment of the defendant's wife.* The defendant's wife was called before the grand jury investigating the pharmacist's death. The minutes of her grand jury testimony were used at trial by the prosecution to impeach her testimony on behalf of the defendant. The defendant claims that, because his wife was not advised at the time of her appearance before the grand jury of her statutory privilege not to testify against her husband, see G. L. c. 233, § 20, Second, the prosecution should have been precluded from using that testimony for impeachment purposes at trial. The defendant also attacks the prosecutor's use of the grand jury minutes on the ground that his wife's statements were founded in part on private conversations with the defendant, in violation of the disqualification created by G. L. c. 233, § 20, First.[29]

---

[29] We intimate no opinion whether the spousal privilege may be invoked during a grand jury investigation. We note, however, that whereas the spousal disqualification is applicable at "any proceeding civil or

We find neither argument persuasive.  Even if the failure to apprise the defendant's wife of the spousal privilege before she testified to the grand jury was error, the defendant has no standing to contest an alleged infringement of a privilege he could not have exercised.  See *Commonwealth* v. *Stokes,* 374 Mass. 583, 595 (1978).  The defendant, who would have been precluded from challenging a failure adequately to advise his wife of the spousal privilege before she gave direct testimony adverse to him at trial, *Commonwealth* v. *Stokes, supra,* cannot improve his position by attacking impeachment evidence resulting from such an omission at a prior proceeding.  The defendant does have standing to contest the use of testimony his wife was incompetent to present under the G. L. c. 233, § 20, Second, disqualification; however, no such testimony appears in the grand jury minutes or in the portion thereof used by the prosecutor in his cross-examination of Cheryl Paszko.[30]  There was no

criminal," G. L. c. 233, § 20, First, as amended through St. 1963, c. 765, § 3, the spousal privilege is available *"in the trial* of an indictment, complaint or other criminal proceeding *against the other* [spouse]" (emphasis supplied).  G. L. c. 233, § 20, Second.

[30] Much of Cheryl Paszko's grand jury testimony concerned the June 8 ride to Brattleboro, Vermont, during which the defendant's sister-in-law was present.  Although Cheryl Paszko was asked what she and her husband were "talking about" at another point when Federman may not have been present, that question was not answered.  Asked by a grand juror about a conversation with her husband on a certain matter, Cheryl Paszko answered that she had not spoken to her husband about that subject.  The witness did not answer a question whether the defendant had discussed Federman with her.  Although, in response to one question, Cheryl Paszko said that the defendant had told her he wanted to go to Toledo, the record does not indicate whether the defendant and his wife were alone when the defendant made that statement.  Thus, the defendant has not shown that the statement was made in a private conversation.  Even if the information was acquired during a private conversation, the answer to the one question was not prejudicial to the defendant and does not so undermine the public policy protecting the marital relationship as to require a new trial.  All other questions directed to Cheryl Paszko at the grand jury concerned conversations with the defendant that occurred in the presence of third parties, and hence are beyond the scope of the prohibition of G. L. c. 233, § 20, Second.  See *Commonwealth* v. *Wakelin,* 230 Mass. 567, 574 (1918); P.J. Liacos, Massachusetts Evidence 179-180 (5th ed. 1981).

error in the judge's decision to permit impeachment of the defendant's wife with her grand jury testimony.[31]

8. *The timing of the summations and instructions.* The defense rested at approximately 3:15 P.M. on a Thursday afternoon. The defendant's request to recess until Friday morning was denied by the judge, who noted that he did not want the jury to begin deliberations on the case on a Friday afternoon. The defense counsel's closing argument began at 4 P.M., and was followed by the prosecutor's summation, which began at 6:15 P.M. and ended shortly before 7 P.M. The jury foreman spoke to the judge during a brief interval separating the two arguments and advised the judge that a majority of the jurors were of the opinion that "it would be easier if you gave us instructions tonight, for us to deal with it." The judge charged the jury from 8:35 P.M. until 10:10 P.M., then recessed until the following morning.

The defendant submits that the judge's refusal of his request to postpone closing arguments and the jury charge until Friday morning constituted prejudicial error. We agree that it would have been better practice for the judge, at the end of a seven-week trial, to defer closing arguments and instructions until the next day instead of keeping the jury into

---

[31] Because we find unmeritorious the defendant's claim that his wife's grand jury testimony was obtained in violation of G. L. c. 233, § 20, we do not reach the Commonwealth's argument that testimony produced in violation of the statutory spousal privilege or disqualification should be admissible for impeachment purposes. Cf. *Harris* v. *New York,* 401 U.S. 222 (1971); *Oregon* v. *Hass,* 420 U.S. 714 (1975); *Commonwealth* v. *Mahnke,* 368 Mass. 662, 697 (1975) (exclusionary rule inapplicable to impeachment use of voluntary testimony obtained in violation of constitutional rights).

It also follows from our conclusion that there was no error in the judge's rejection of the defendant's request that the indictment be dismissed because of the possibility that the grand jury was influenced by testimony violative of G. L. c. 233, § 20. Our inquiry into the defendant's wife's grand jury testimony is necessitated by the defendant's challenges to the use of that testimony at trial. We need not decide whether an exception to the general rule that we "will not inquire into the competency . . . of the evidence before the grand jury," *Commonwealth* v. *Galvin,* 323 Mass. 205, 211-212 (1948), should be carved out for indictments alleged to be based on testimony violative of G. L. c. 233, § 20.

the night.  A defendant is entitled to have summations and instructions delivered at a time when the jurors are fresh enough to be attentive and receptive to such critical information.  However, we will not disturb a judge's exercise of his discretion to grant or deny a motion to recess "unless there is patent abuse of that discretion, which is to be determined in the circumstances of each case." *Commonwealth* v. *Bettencourt*, 361 Mass. 515, 517-518 (1972) (motion for continuance).  See *Commonwealth* v. *Fleming*, 360 Mass. 404, 409 (1971); *Commonwealth* v. *French*, 357 Mass. 356, 405 (1970), vacated as to death penalty sub nom. *Limone* v. *Massachusetts*, 408 U.S. 936 (1972).

The judge was in the best position to weigh the risk that the fact-finding function of the jury would be impaired if deliberations over the testimony of the many witnesses and multiple exhibits did not commence until the eve of a weekend, and to determine whether that risk warranted the presentation of closing arguments and instructions on Thursday afternoon and night.  In light of the foreman's assertion of the jurors' belief that their comprehension of the case would be facilitated if they were instructed on Thursday night, we cannot say that the judge's decision resulted in the presentation of summations and instructions to a reluctant or exhausted jury, or that the defendant was deprived of his right to a clear presentation of his case and understandable jury instructions.  We conclude that the decision to deny the defendant's motion to recess was not a patent abuse of the judge's discretion.

9. *Relief pursuant to G. L. c. 278, § 33E.*  Consistent with our duty under § 33E, we have considered the entire case on the law and the evidence and conclude that the verdict on the indictment for murder in the first degree was neither against the law nor against the weight of the evidence, and that the interests of justice do not require either a new trial or entry of a verdict of a lesser degree of guilt.

*Judgment affirmed.*

APPENDIX

A-1. The defendant filed a motion to dismiss the indictment after it was established that a woman, who told the police that she had overheard a conversation in which the defendant admitted killing the victim, had lied. Although the woman did not testify before the grand jury, a detective who did testify referred to her allegation. The detective advised the grand jury that another party to the conversation during which the purported admission was made had stated that the woman "was only telling half the truth," and that the woman herself admitted that her story was exaggerated and embellished.

The defendant does not allege that the detective knew the hearsay testimony to be false at the time it was presented. Cf. *Commonwealth* v. *Salman*, 387 Mass. 160, 166 (1982) (knowing use of false testimony to procure indictment constitutes ground for dismissal). The grand jury was alerted that the veracity of the woman's allegation was disputed. Other evidence linking the defendant to the crime was offered in the course of the detective's testimony and the testimony of twelve other witnesses appearing before the grand jury. The defendant had not met his burden of demonstrating that "the integrity of the grand jury process has been impaired." *Commonwealth* v. *Salman, supra* at 166. The motion to dismiss the indictment was properly denied.

A-2. The judge did not abuse his discretion in denying the defendant's motion for a change of venue due to pretrial publicity. Although the defendant's status as a suspect, his arrest in New York, and his conviction of two unrelated offenses in the summer of 1980 were the subject of a great many articles appearing in several newspapers of general circulation in the Northampton area, "it is not necessary in the interests of a fair trial that all citizens who have read of or been interested in a crime be excluded from the jury or that the trial take place where few such citizens will be found." *Commonwealth* v. *Blackburn*, 354 Mass. 200, 204 (1968). The record is devoid of "any indications in the totality of circumstances that [the defendant's] trial was not fundamentally fair." *Murphy* v. *Florida*, 421 U.S. 794, 799 (1975). The trial occurred ten months after the crime. The venire included fourteen potential jurors who knew nothing of the crime, another sixteen who remembered hearing about the crime but could recall no details, and twelve who recalled only minor details about the location of the crime or the occupation of the victim. Of the sixteen jurors selected from the venire, four had no exposure to pretrial publicity, six recalled no details of the crime, and six recalled some details relating to the crime, but knew nothing about the defendant. The judge conducted an individual voir dire of every prospective juror. Each of the selected jurors who had been exposed to pretrial publicity stated that he or she could nonetheless render a fair and impartial verdict. The defendant expressed his approval of every juror seated. The judge granted a motion by

the Commonwealth to close pretrial hearings to the press and the public in order to avoid additional prejudicial publicity. Although some of the articles, reporting the defendant's prior criminal activities, including a breaking and entering into a drug store in Chicopee, "might well have been prejudicial if read and remembered by members of the jury, the [defendant] has failed to establish this to be a fact." *Delle Chiaie* v. *Commonwealth*, 367 Mass. 527, 532 (1975).

A-3. The defendant alleges in his brief that a mistrial should have been declared because of prejudicial publicity during the trial. The judge permitted a television camera to televise the trial, but required that the camera be positioned so as to preclude a full frontal view of the defendant. After the trial had commenced, the defendant noted the potential effect upon the upcoming testimony of witnesses Curtin, O'Leary, and Washington of the prior evening's television broadcast, in which the defendant was featured, and of a photograph of the defendant that had appeared in a Springfield newspaper the day before. The defendant did not, however, request a voir dire to establish any potential effect of such publicity on the testimony of the identification witnesses. Moreover, O'Leary and Washington testified only to out-of-court identifications that took place prior to the allegedly prejudicial publicity. Curtin, who did make an in-court identification of the defendant, said on cross-examination that he had seen neither the television coverage nor the newspaper photograph of the defendant that defense counsel brought to the judge's attention. The defendant failed to establish any prejudice. There was no error.

A-4. The judge did not abuse his discretion in admitting in evidence two color photographs of the victim taken at the autopsy. One photograph, depicting a metal probe inserted into and protruding from the entrance wound, demonstrated the trajectory of the bullet that killed the victim. The trajectory of the bullet, which entered the victim's right ear and proceeded in a downward and forward direction, was material to the prosecution's theory of premeditated murder. See *Commonwealth* v. *Clark*, 363 Mass. 467, 472 (1973). The other photograph demonstrated the size of the bullet wound. The pathologist, who testified for the prosecution that the cause of death was a .22 caliber bullet wound, was cross-examined as to his ability to distinguish such a wound from one caused by a bullet of larger caliber, and testified that the size of the wound was inconsistent with a caliber larger than .25. Both photographs could "aid the jury, as lay people, in making a finding of fact on a contested point." *Commonwealth* v. *Bastarache*, 382 Mass. 86, 106 (1980). Although the area surrounding the entrance wound was bloody, in part due to postmortem examination, this was not a case "where the evidential value of the photographs which went to the jury was overwhelmed by the prejudicial effect." *Commonwealth* v. *Richmond*, 371 Mass. 563, 565 (1976). Cf. *Commonwealth* v. *Bastarache, supra* at 105-106 (autopsy photographs of victim's brain and skull interior after brain removed); *Com-*

monwealth v. Richmond, supra (photograph of injuries caused by dog who chewed victim's face sometime after victim's death).

A-5. The Commonwealth was permitted to introduce in evidence a variety of drugs found in the defendant's automobile when he was arrested in New York. The defendant argues that, because the drugs could not be identified as coming from Merrigan's Pharmacy, they should have been excluded on the ground that their prejudicial effect outweighed their probative value. See Commonwealth v. D'Agostino, 344 Mass. 276, 279 (1962). Although no identifying marks were found on the seized containers (there was evidence that the defendant had removed identifying labels prior to the arrest), the drugs had probative value. Some of the drugs correspond to those determined to be missing from Merrigan's by an inventory conducted after the shooting. Cf. Commonwealth v. Locke, 335 Mass. 106, 113-114 (1956) (bills of same denominations as those stolen admitted in evidence). The evidence thus had "a rational tendency to prove" the prosecution's theory that the defendant shot the victim in the course of a drug-related robbery. Commonwealth v. Durkin, 257 Mass. 426, 427-428 (1926). That other drugs found in the automobile were not established to be missing from Merrigan's "affect[ed] the weight rather than the admissibility of that evidence." Commonwealth v. Berth, 385 Mass. 784, 791 (1982). It may be conceded that evidence that a defendant possessed large quantities of controlled substances could prejudice the jury against that defendant. In the circumstances of this trial, in which there was recurring evidence of the defendant's use of drugs, there is little likelihood, however, that any incremental prejudice was occasioned by the jury's exposure to the drugs found in the defendant's vehicle. The judge did not abuse his discretion in admitting the evidence.

The defendant also argues that, because possession of controlled substances is a criminal offense unrelated to the crime for which the defendant was being prosecuted, by admitting the drugs the judge improperly permitted the prosecution to present to the jury evidence of prior criminal acts by the defendant. The short answer to this contention is that "[t]he fact that evidence otherwise relevant and material may indicate that the defendant committed another crime does not make it inadmissible." Commonwealth v. Caine, 366 Mass. 366, 370-371 (1974).

A-6. Richard Paszko's failure to identify positively the pistol in evidence as being the pistol that disappeared from his house after the defendant and his wife lived there went to the weight of Richard Paszko's testimony, not to its admissibility. See Commonwealth v. Grant, 352 Mass. 434, 438 (1967). That the jury may have inferred from the testimony a prior criminal act by the defendant, namely, theft of the gun, did not require that the testimony be excluded where, as here, it was probative of the defendant's access to the weapon with which the victim was shot. Commonwealth v. Caine, supra. There was no error in the judge's determination that Richard Paszko's testimony was admissible or in the judge's

denial of the defendant's motion for mistrial based on the prosecution's reference in its opening statement to the anticipated testimony of Richard Paszko. *Commonwealth* v. *Hartford*, 346 Mass. 482, 486 (1963).

A-7. The defendant, alleging that the prosecution failed to establish a chain of custody, objected to the admission of a shell casing that, according to the prosecution, was found at Merrigan's. The letter "F" was imprinted on the shell casing introduced in evidence. The Commonwealth's ballistics expert testified that he received the casing from a police detective, who testified that he obtained the casing from the officer who found it at Merrigan's. The officer who found the casing was asked on cross-examination whether he had seen the letter on the casing and responded: "I don't recall it. I believe it was probably a 'U'. And I can't say for sure." The officer's uncertainty about the marking on the casing did not render the item inadmissible. "Any weaknesses which might exist in the chain of custody affect only the weight of the evidence, not its admissibility." *Commonwealth* v. *Hoffer*, 375 Mass. 369, 377 (1978).

A-8. The defendant alleges error in the judge's refusal to permit the impeachment of Toni Federman and the Commonwealth's ballistics expert through testimony by the defendant's investigator about prior inconsistent statements made to him by the two witnesses. The defendant made an offer of proof that the investigator would testify that Federman "told him that she was pretty sure that [the defendant] might have had a scar on his forehead" on June 6, 1980. Federman, who initially testified on cross-examination that she did not recall whether the defendant had a scar on that date, was later asked about her statement to the investigator and responded, "I don't deny that's what I said." The judge was under no obligation to permit repetitious impeachment through another witness.

The defendant also made an offer of proof that the investigator would testify that the Commonwealth's ballistics expert had told him that he first saw the weapon in evidence "for test purposes" on October 28, 1980. On direct examination the expert stated that he had seen the weapon for one half-hour on October 22 or 23, but did not take custody of it then because it was needed for fingerprinting tests. The judge acted within his discretion in excluding the investigator's testimony, whether the basis of his decision was that the statement to the investigator was not inconsistent with the expert's direct testimony, that the issue was collateral, or that the defense should not be permitted to impeach a witness without the witness being present to explain the alleged inconsistency. See *Commonwealth* v. *Berth*, 385 Mass. 784, 790 (1982); *Commonwealth* v. *West*, 312 Mass. 438, 440 (1942).

The defendant also alleges error in the judge's decision to preclude impeachment of O'Leary, Curtin, and Washington through the introduction, after the witnesses had left the stand, of excerpts from the transcripts of their voir dire testimony. The three identification witnesses were thoroughly cross-examined. The defense attorney used his notes of the witnesses'

voir dire testimony in the course of his cross-examination. There was no error in the judge's determination that further impeachment through the transcript after the witnesses had been excused was unnecessary. See *Commonwealth* v. *Berth, supra.*

A-9. In his instructions on consciousness of guilt, the judge told the jurors that they could consider, as evidence of a guilty mind, "those portions of the evidence where it is alleged that the Defendant failed to surrender himself or fled from the area, or disposed of incriminating evidence or changed his address." The defendant asserts that the reference to his failure to surrender himself improperly burdened him with an affirmative obligation to surrender to the police and thereby compromised his privilege against self-incrimination. The instructions as a whole created no such burden. The judge cautioned the jurors to be careful in drawing from the fact of nonsurrender an inference adverse to the defendant, "because situations might occur in which innocent persons . . . may forget that the surest refuge of innocence is the truth, and may attempt to secure their safety by hiding or refusing to surrender." Moreover, the privilege against self-incrimination is not implicated by the evidentiary use of nontestimonial acts or omissions by the defendant. See *Commonwealth* v. *Brennan,* 386 Mass. 772, 776 (1982).

A-10. There was no error in the judge's refusal to instruct the jury on self-defense, manslaughter, or accident. See *Commonwealth* v. *Evans,* 390 Mass. 144, 151 (1983).

A-11. The defendant requested that the jury be instructed to return a verdict no greater than murder in the second degree if the jurors found that the defendant was under the influence of alcohol or drugs at the time the shooting occurred. The judge instructed the jury that the defendant could not be found guilty of murder in the first degree under a premeditation theory if, as a result of voluntary drug addiction, he was so intoxicated that he was mentally incapable of deliberate premeditation. The defendant claims error in the judge's refusal to instruct the jury that voluntary intoxication would also mitigate murder in the first degree under the felony-murder theory. We have repeatedly declined to rule that consumption of or addiction to alcohol or drugs warrants a finding of absence of specific criminal intent, *Commonwealth* v. *Loretta,* 386 Mass. 794, 800 (1982); *Commonwealth* v. *Sheehan,* 376 Mass. 765, 772-776 (1978); *Commonwealth* v. *Johnson,* 374 Mass. 453, 462-465 (1978); *Commonwealth* v. *Stewart,* 359 Mass. 671, 679 (1971), judgment vacated per curiam as to death penalty, 408 U.S. 845 (1972), and have indicated that we would consider doing so "only where . . . a clear indication of the influence of drugs on the defendant's state of mind," *Commonwealth* v. *Sheehan, supra* at 775, is provided by expert testimony, *Commonwealth* v. *Loretta, supra* at 800. No such evidence was presented in this case. The judge properly refused to give the requested instruction.